UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DONALD RAY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 05-239-P-H |
| | ) | |
| KEVIN DONOVAN, et al., | ) | |
| | ) | |
| Defendants | ) | |

***Recommended Decision on Motion for Summary Judgment
by Defendants Bergquist and Donovan***

In this removed civil rights action Donald Ray complains that on September 10,

1999, while he was driving a truck loaded with bottled water, he was stopped and

arrested without probable cause and unnecessarily handcuffed for a prolonged period

despite his protestations of pain.[1]  He alleges that for three days he was held at the York

County Jail and his truck and water shipment were impounded.   While at the jail Ray

was not told why he was arrested, his protestations that his handcuffs were too tight went

unheeded, his money (including rare coins and silver certificates) were taken and never

given back, and he was not informed that bail had been set for $500.  In his complaint

Ray sets out three counts: Count I charges that his right to due process was infringed,

Count II alleges an equal protection violation, and Count III seeks attorney fees and costs

(Ray is proceeding pro se).   Two of the defendants, Kevin Donovan and Eric Bergquist

move to dismiss the complaint for failure to state a claim or, in the alternative, for

---

[1]      In his general allegations of his amended complaint Ray alleges that "Donovan and Bergquist used
excessive force in arresting the Plaintiff and placed handcuffs on the Plaintiff that were extremely tight,
which caused cutting, bruising, extreme pain, and permanent damage to the Plaintiff's wrists."  (Am.
Compl. ¶ 10.)

summary judgment (Docket No. 35).   Also pending is Ray's third motion to amend his complaint to expressly set forth two counts under the Fourth Amendment: unreasonable seizure and use of excessive force.  (Docket No. 48.)  I deny the motion to amend and recommend that the court deny the defendants' motion to the extent that it seeks dismissal for failure to state a claim and I recommend that the court grant the motion for summary judgment.

*Discussion*

**Third Motion to Amend**

Ray filed his third motion to amend on October 2, 2006.  As indicated above, the amendment seeks to amend his complaint so that it expressly sets forth an additional count for Fourth Amendment violations apropos his alleged unreasonable seizure and the use of excessive force.  This motion to amend was filed after Donovan and Bergquist filed their motion for summary judgment.  As to Donovan and Bergquist the allegations in the proposed third amended complaint under the proposed fourth count state that Bergquist used excessive force against Ray when he handcuffed him too tightly and refused to loosen the handcuffs when Ray complained (Proposed 3d Am. Compl. ¶ 30); Donovan unconstitutionally allowed Ray to be subjected to excessive force by failing to loosen the handcuffs when Ray complained (id. ¶ 31); Bergquist unreasonably seized Ray by stopping him without probable cause, thereafter handcuffing and detaining him for around an hour (id. ¶ 32); and that Donovan unreasonably seized Ray by arresting him without a warrant and unreasonably seized Ray's truck and load (id. ¶ 33).

In objecting to the motion to amend, the defendants argue that the deadline for amendments passed over six months ago and Ray does not meet the Federal Rule of Civil

Procedure 16(b) "good cause" standard for allowing such an amendment.   They also attack Ray's contention that his amendment should be allowed as an amendment made to conform to the evidence under Federal Rule of Civil Procedure 15(b).

The defendants have valid arguments for disallowing the third amendment and I disallow Ray's motion.  However, I do proceed to adjudicate the merits of the defendants' motion by reading Ray's operative amended complaint as to what claims he fairly stated as a pro se plaintiff and with a particular eye to how the defendants extrapolated and framed those claims in preparing their motion for summary judgment. In this case these defendants were very generous towards Ray in setting forth the claims that they construed to be against them and, as it turns out, there is really no prejudice to Ray in denying his motion to amend as to Donovan and Bergquist because, following these defendants' lead, I have analyzed the claim under the Fourth Amendment in any event.

### Susceptibility of the Complaint to Dismissal

First, the defendants' assertions that Ray's complaint fails to state a claim of a stop without probable cause, an arrest without probable cause, and excessive force,[2] are patently without merit.  Federal Rule of Civil Procedure 8(a)(2):

> provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. See id., at 47-48; Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168-169, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). "The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted

---

[2]   The defendants do not argue that his equal protection count fails to state a claim.

3

surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court." 5 C. Wright & A. Miller, Federal Practice and Procedure § 1202, p. 76 (2d ed. 1990).

Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions.

Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512-13 (2002); see also Instituto de

Educacion Universal Corp. v. United States Dept. of Educ., 209 F.3d 18, 24 n.4 (2000).

In their reply memorandum the defendants argue that Ray has waived opposition

to the motion to dismiss on his claims that Ray was arrested and seized without probable

cause or without reasonable suspicion because Ray's response makes no argument or

citation to authority.  They also assert that Ray made no argument against their assertion

that his excessive force for handcuffing (and the failure-to-intervene excessive force

claim against Donovan) should be dismissed for want of a response.  Given Ray's

extensive response to the motion for summary judgment I conclude that granting the

motion to dismiss on some theory of waiver apropos the dismissal portion of the

defendants' unified motion would be an unfair sanction under the local rules.  See Dist.

Me. Local R. 7(b); Pomerleau v. West Springfield Public Schools, 362 F.3d 143, 145, n.

1 (1st Cir. 2004); see also ITI Holdings, Inc. v. Odom, __ F.3d ___, 2006 WL 3290999,

*1 -2 (1st Cir. Nov. 14, 2006) (recognizing the discretion of the court to dismiss as a

sanction an unopposed motion to dismiss under Local Rule 7(b) apropos Federal Rule of

Civil Procedure 12(b)(6), concluding that nothing in the text of Rule 12(b)(6) "compels

the court to apply any particular standard in deciding whether to grant or deny a

motion").

### *The Summary Judgment Record*[3]

#### **The Standard**

The following statement of facts is drawn from the parties' statements of material

fact in accordance with this District's summary judgment practice.  See Dist. Me. Loc. R.

56; Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining

the procedure); Toomey v. Unum Life Ins. Co. Am., 324 F. Supp. 2d 220, 221 n.1 (D.

Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).  Pursuant to Rule 56 of

the Federal Rules of Civil Procedure, all evidentiary disputes generated by the parties'

statements have been resolved in favor of Scott.  See Merchs. Ins. Co. N.H. v. U. S. Fid.

& Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  The defendants' motion should be granted

because "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material

fact and ...[they are]  entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

#### **The Facts**

#### ***Bergquist's and Donovan's Training***

Trooper Eric Bergquist was hired by the Maine State Police on September 20,

1998.  Prior to this employment he earned an Associate of Science Degree in Criminal

Justice from Mount Wachusett Community College and a Bachelor of Science Degree in

Criminal Justice from Westfield State College. (Defs. SMF ¶ 1.)  Bergquist's police

officer training has included the Reserve Intermittent Police Officers Basic Course in

Massachusetts in 1995 comprising 48 hours, the Massachusetts Special State Police

---

[3]       The defendants have filed a pleading in response to Ray's response to their motion and statement of fact which attempts to set forth their own additional facts and relies on new record evidence.  This added layer of facts by the moving party is not part of summary judgment practice, Ray has no avenue for responding to the facts and the evidence, and I have not included these facts as part of the evidentiary record.

Recruit Class of 1996 comprising 440 hours, and completion of the 46th Maine State

Police Academy Class in 1999, comprising 1080 hours. Prior to becoming employed by

the Maine State Police Bergquist was employed in law enforcement as a law enforcement

officer at Bentley College Police Department in Waltham, MA from 1996 to 1998. (Id.

¶ 2.) Bergquist has had training in the use of handcuffs and in the use of force incident to

making an arrest. The training regarding handcuffing included proper application of

handcuffs, checking them for fit, and being sure that they were double locked so that they

would not tighten over time while the arrestee was being held and transported in custody.

At the Reserve Intermittent Police Officers Basic Course in Massachusetts in 1995 he

received approximately 8 hours of training in use of force including handcuffing

techniques, at the Massachusetts Special State Police Recruit Class of 1996 he received

approximately 40 hours training in those areas, and at Maine State Police Academy Class

in 1999 approximately 80 hours. (Id. ¶ 3.) Prior to the date of the incident complained of

in Ray's complaint, Bergquist had applied handcuffs in training and in actual law

enforcement situations hundreds of times. He has also received hours of diversity and of

harassment training; this training is designed to educate him in how to avoid incidents of

harassment including racial harassment.  (Id. ¶ 4.)

　　　At all times relevant to this case Kevin Donovan was employed as a Maine State

Trooper, having been a trooper since September 3, 1984. He has an Associate of Science

Degree in Law Enforcement and received his police basic training in the 38th Maine

State Police Academy Training Class at the Maine Criminal Justice Academy in 1984.

Since then he has continued to receive training on at least an annual basis, including

hours of harassment training; this training is designed to educate him in how to avoid

incidents of harassment including racial harassment.  (Id. ¶ 5.) On November 29, 1990,

Donovan became a Certified Commercial Vehicle Inspector with the Maine State Police

Commercial Vehicle Enforcement Unit ("CVEU").  As an inspector he is familiar with

the Federal Motor Carrier Safety Regulations; during the years he was assigned to the

CVEU he enforced the State of Maine Motor Carrier Safety Rules contained in Chapter 4

of the Rules of the Department of Public Safety, Bureau of State Police. Those rules, as

promulgated by the Bureau of State Police, have adopted by reference various federal

regulations governing the safe operation of motor carriers. The federal regulations are

found in 49 Code of Federal Regulations, Parts 40, 382, 390, 391, 392, 393, 395, and

396.  (Id. ¶ 6.)  Prior to, and at the time of the events alleged in the complaint, he had

continuously worked in the CVEU since 1990.  During his employment in the CVEU he

had several occasions to personally witness the aftermath of motor vehicle collisions

caused by fatigued tractor trailer truck operators. (Id. ¶ 7.) Donovan has been involved as

lead investigator in approximately four fatality investigations in which the defendant

tractor trailer operators were convicted of being a fatigued driver in addition to other

charges, including manslaughter. (Id. ¶ 8.)[4]

### The Stop and Arrest

Ray is a black, African-American, independent truck driver from Illinois. (Pl.'s

SAMF ¶ 92; Defs.' Resp. SAMF ¶ 92.)  On September 10, 1999, he was hauling a load of

bottled water from Poland, Maine to New York City. (Pl.'s SAMF ¶ 93; Defs.' Resp.

SAMF ¶ 93.)  He was not due into New York City until the next morning. Consequently,

since he had plenty of time, Ray decided to take the most direct route to New York, via

---

[4]     These preceding two statements of fact have dubious materiality to the legal standards at issue in
this suit.

back roads rather than the highway, because it would be more scenic and take less diesel fuel. (Pl.'s SAMF ¶ 94; Defs.' Resp. SAMF ¶ 94.) Unfortunately, Ray laments, when he got to Limerick, Maine he turned right onto Route 5 and then left onto Route 160 north, rather than left onto Route 5 and then right onto Route 11 south. (Pl.'s SAMF ¶ 95.)  The defendants concede that Ray had recently been driving north on Route 160 when Bergquist encountered Ray. (Defs.' Resp. SAMF ¶ 95.)

**Bergquist's involvement**

On September 10, 1999, Bergquist was on duty in his cruiser traveling north on Route 160 in Limerick, Maine. Route 160 is a two-lane, narrow, mountainous, winding, rural road with each lane being approximately ten feet in width; there are no shoulders on the road.  (Id. ¶ 9; Pl.'s Resp. SMF ¶ 9.)  According to Bergquist, in the vicinity of the Cram Road just after 6:00 p.m. as he crested a small hill he observed a tractor trailer truck backing toward him in the north bound lane, the lane in which Bergquist was traveling. He applied his brakes, stopped his cruiser, and watched as the tractor trailer continued to back up for a short distance, it then stopped and pulled forward a short distance and stopped again. When it stopped finally, it, according to Bergquist, occupied almost the entire north bound lane. Bergquist parked his cruiser behind the tractor trailer and activated the blue flashing lights. (Defs.' SMF ¶ 10; Bergquist Dep. at 4-5; Bergquist Aff. ¶ 9; Defs.' Resp. SAMF ¶ 98; Defs.' Resp. SAMF ¶¶ 99, 100, 101, 141.)  There is no dispute that when Ray first noticed the state police cruiser behind him, the cruiser's overhead flashing lights were not activated. (Defs.' SMF ¶ 14; Pl.'s SAMF ¶ 14.)

Per Ray, he was backing his tractor trailer in the south (as opposed to the north) bound lane - in the proper lane and direction for traffic to go with his headlights and

8

hazard lights on -- and when he stopped his truck it was entirely in the south bound lane. (Pl.'s Resp. SMF ¶ 10; Ray Aff. ¶¶ 7,9,10; Pl.'s SAMF ¶¶ 98, 100, 101, 141.)  Ray asserts that he had been going "only" about a quarter of a mile in reverse when Bergquist pulled his cruiser in behind him and stopped him. (Pl.'s SAMF ¶ 99; Ray Aff. ¶ 8.)

At the time of the events relevant to this action Bergquist patrolled Route 160 on a regular basis and he resided within a few miles of the location where he encountered Ray and the tractor trailer. It was extremely unusual for Bergquist to see a tractor trailer truck on Route 160.  (Defs.' SMF ¶ 11.)  At the time, Ray's tractor-trailer, and load weighed approximately sixty to seventy-thousand pounds and was approximately 61 feet in length. (Id. ¶ 12; Pl.'s Resp. SMF ¶ 12.)

According to the defendants, because the road is a narrow, winding, hilly road, and there are no shoulders, Ray's action in backing his vehicle presented an immediate danger to vehicular traffic traveling in both directions on Route 160. (Defs.' SMF ¶ 13; Bergquist Aff. ¶ 12; Defs.' Resp. SAMF ¶ 102.) Furthermore, Ray was planning on backing off the road and turning around, a maneuver that would likely have blocked the entirety of Route 160 to traffic both north and southbound  since his rig's length was triple the width of both lanes of the road. (Defs.' SMF ¶ 13; Ray Dep. at 69; Defs.' Resp. SAMF ¶ 102.) Ray denies these assertions by indicating that he was backing down the road and was going to turn into the driveway of a farm so that he could turn around, an intention that was unrealized because of the position of Bergquist's vehicle.  Ray states that he was backing in the direction that traffic should go with headlights and hazards on. He was not going to turnaround in the road and he would not have blocked traffic.  (Pl.'s SAMF ¶ 13; Ray Aff. ¶¶ 7, 11; Pl.'s SAMF ¶ 102; Pl.'s SAMF ¶ 132.)

The parties agree that Ray got out of his truck and walked back toward the cruiser and Bergquist met him about at the rear of Ray's truck. (Pl.'s SAMF ¶ 103; Defs.' Resp. SAMF ¶ 103.)  According to the defendants, in a brief conversation Ray explained to Bergquist that he was trying to get to New York, that he was lost, and was backing up in an effort to turn his tractor trailer around. (Defs.' SMF ¶ 15; Bergquist Dep. at 5-6; Defs.' Resp. SAMF ¶ 104.)  Per Ray, he did not say that he was lost but told Bergquist that he had missed his turn and that he was backing up in order to turn around to enable him to go back and take the road that he had missed.  (Pl.'s Resp. ¶ 15; Ray Aff. ¶ 13; Pl.'s SAMF ¶ 104.)

The parties do not contest that Ray had his license on his person, but it was necessary for him to go to the cab of the vehicle in order to procure the registration.  Ray walked in front of Bergquist and he produced the registration for the vehicle.   (Defs.' SMF ¶ 16; Pl.'s Resp. SMF ¶ 16; Pl.'s SAMF ¶ 105; Defs.' Resp. SAMF ¶ 105.) According to Ray as they walked to the car Bergquist un-strapped his firearm and began to remove it but stopped when Ray asked him "what the heck he was doing."  (Pl.'s Resp. SMF ¶ 16; Ray Aff. ¶ 14; Pl.'s SAMF ¶ 105.)  According to the defendants Ray and Bergquist walked toward the cab of the vehicle without incident and Bergquist did not remove his sidearm from its holster, nor did he unfasten the strap which secures the sidearm in the holster. (Defs.' SMF ¶ 16; Bergquist Aff. ¶ 13; (Defs.' Resp. SAMF ¶ 105.)[5]

---

[5]       On this score the defendants state:
           For the alleged fact that defendant Bergquist unstrapped his gun and began removing it from its holster, plaintiff relies upon Paragraph 14 of the Affidavit dated and sworn to on September 27, 2006, that he filed with his response to the motion for summary judgment. Plaintiff's deposition testimony was taken over two days and was completed on June 22, 2006, long before the Affidavit. "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist

Ray contends that Bergquist required Ray to give him, and Bergquist looked over, all of his paperwork, including his commercial vehicle documentation and physical form, as Ray went back to his truck and brought his log book current (Pl.'s Resp. SMF ¶ 26; Ray Aff. ¶ 15; Pl.'s SAMF ¶¶ 105, 106, 107; Ray Aff. ¶¶ 14, 15, 16).  Ray maintains that he affirmatively tried to show Bergquist his long form physical document but Bergquist refused to look at it. (Pl.'s SAMF ¶ 108; Ray Aff. ¶ 17.)  Ray further asserts that Bergquist told him to bring his log book current, which he did. Consequently, Ray's log book was current by the time Trooper Donovan arrived. (Pl.'s SAMF ¶ 109; Ray Aff. ¶ 18.)

The defendants contend that Bergquist had not checked Ray's commercial vehicle documentation and did not check his United States Department of Transportation Physical Form. (Defs.' SMF ¶ 26; Bergquist Dep. at 25; Defs.' Resp. SAMF ¶¶ 105, 108.) They state that Bergquist reviewed only Ray's license and registration and that the later-to-arrive Trooper Donovan was the trooper who checked the commercial documents that Ray produced. (Defs.' Resp. SAMF ¶ 106.)   According to the defendants, it was Donovan who inspected Ray's log and Ray brought it up to date in Donovan's presence. (Defs.' Resp. SAMF ¶ 109.)

The defendants assert that Ray was asked to wait inside the cab of Ray's vehicle while the validity of his license was checked and he was told by Bergquist that someone

---

summary judgment with an Affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." <u>Colantuoni v. Alfred Calcagni & Sons</u>, 44 F.3d 1, 4 (1st Cir. 1994). At page 80 of his continued deposition, plaintiff testified unambiguously that Bergquist's gun was in the holster and when asked whether or not there was a strap on the holster or whether or not the strap was pulled or was fastened down his response was, "There's no way I would know that." Paragraph 14 of the Affidavit and this Paragraph should be stricken. See, Ray Deposition (continued) at 80.

(Defs.' Resp. SAMF ¶ 105; <u>see also</u> Obj. Pl.'s Resp SMF ¶ 16.)

would be along to help him on his way to New York.[6]  The State Police dispatcher reported that Ray's license was valid and Bergquist asked the dispatcher to send a Commercial Vehicle Enforcement Officer to the scene.[7]  That request was made at 6:10 p.m. and Bergquist was informed at 6:12 p.m. that Officer Donovan of the CVEU would be traveling from South Portland to the scene and would arrive in approximately forty minutes. (Defs.' SMF ¶ 17; Bergquist Aff. ¶ 13; Defs.' Resp. SAMF ¶ 110.)

There is no genuine dispute that Ray was not ordered to wait in the cab pending Donovan's arrival and so, initially, for about a half an hour, he stood outside his truck. (Defs.' SMF ¶¶ 18, 19; Ray Dep. at 87-88; Pl.'s Resp. SMF ¶¶ 17, 18, 19; Ray Aff. ¶ 19; Pl.'s SAMF ¶ 110.)  According to Ray, after a half an hour Bergquist told him that he would have to wait in the back of Bergquist's car and that Bergquist would have to handcuff Ray, which he did.  (Pl.'s Resp. SMF ¶¶ 17, 18, 19; Ray Aff. ¶¶ 19, 20; Pl.'s SAMF ¶¶ 110, 111.)[8]  There is no dispute that Bergquist did not arrest Ray. (Defs.' SMF ¶ 44; Bergquist Dep. at 14; Pl.'s Resp. SMF ¶ 44.)

---

[6]      Ray complains that the officers did not help him on his way to New York but handcuffed him and took him to jail.  (Pl.'s Resp. SMF ¶¶ 17, 18; Ray Aff. ¶ 19; Pl.'s SAMF ¶ 110.)

[7]      There is no genuine dispute Bergquist had graduated from the Maine State Police Academy on April 2, 1999, just five months prior to the date of incidents complained in the complaint. He had been taught that while on patrol, if he encountered a tractor trailer unit, he was to seek assistance from a member of the CVEU. He was not certified to inspect tractor trailer units nor empowered to enforce State of Maine Law and Regulations with respect to those vehicles.  (Defs.' SMF ¶ 19; Bergquist Dep. at 8; Bergquist Aff. ¶ 14.)

[8]      In responding to Paragraph 110 the defendants admit that Ray initially stood outside of his truck for some period of time. The balance of the paragraph they deny because of Ray's reliance on Paragraph 19 of his affidavit which the defendants contend clearly contradicts Ray's deposition testimony concerning the incident. They argue that Ray's deposition testimony clearly and unambiguously states that when he was handcuffed by Bergquist, Donovan had already arrived and in the interim Ray had been waiting in the cab of his truck and waiting by the side of the truck.  (Defs.' Resp. SAMF ¶ 110; Ray Deposition (continued) at pp. 95 – 97, 116; see also Obj. Pl.'s Resp SMF ¶ 18.)  In response to Ray's Paragraph 111 assertion and his reliance on Paragraph 20 of his affidavit, the defendants also contend that Ray's deposition testimony was that Donovan was already on the scene when Ray was handcuffed.  (Defs.' Resp. SAMF ¶ 111; see also Obj. Pl.'s Resp. SMF ¶ 19; Ray Dep. (continued) at 95-97, 116.)

**Donovan's involvement**

There is no real disagreement that at the time of the incidents alleged in Ray's complaint, Trooper Donovan served in a dual capacity as an agent of the Federal Motor Carrier Safety Administration as well as a Maine State Trooper and was familiar with the Federal Motor Carrier Regulations. (Defs.' SMF ¶ 21; Pl.'s Resp. SMF ¶ 21.)   In the early evening of September 10, 1999, Donovan was on duty in the South Portland area when he received a call from the dispatcher that Trooper Bergquist was with a tractor-trailer on Route 160 in Limerick, Maine; he received that radio call at 6:10 p.m. and responded that he would be en route to Limerick as requested. After taking the most direct route available to him, he arrived at the scene on Route 160 at 6:50 p.m., or just short of an hour after Ray was stopped. (Defs.'s SMF ¶ 20; Donovan Dep. at 4; Donovan Aff. ¶ 3; Pl.'s Resp. SMF ¶ 20; Ray Aff. ¶ 30.)

According to Donovan, when he arrived at the scene a tractor trailer was parked in the north-bound lane of Route 160 sitting in the middle of the lane. (Defs.'s DMF ¶ 22; Defs.' Resp. SAMF ¶ 122.) According to Ray the truck was in the southbound lane and the reason that it was still there when Donovan arrived was because Bergquist told Ray that he could not move it, even though Ray had told Bergquist that he thought the truck was creating a hazard.  (Pl.'s Resp. SMF ¶ 22; Ray Aff. ¶ 81; Pl.'s SAMF ¶ 122.)  There is no dispute that in Donovan's experience it was extremely unusual to find a tractor trailer on Route 160.  (Defs.' SMF ¶ 24.)  Because it was reported to Donovan by Bergquist that the tractor trailer truck was backing southbound in the northbound lane on this narrow road, he was more interested in the condition of the driver than in the condition of the vehicle.  Donovan spoke with Ray and checked various documents that he, as a

commercial vehicle operator, was required to have in his possession by Federal and State Law.  Included among those documents were his log book, his medical card, and the shipping papers for the load he was transporting.  (Defs.' SMF ¶ 25; Pl.'s Resp. SMF ¶ 25.)

According to Donovan, Bergquist's cruiser was parked behind Ray's truck with the flashing blue lights activated.  Donovan conversed with Bergquist to learn the reasons why he had requested the presence of a trooper from the CVEU.  He was told by Bergquist that he had encountered the tractor trailer as it was backing south in the northbound lane on Route 160, that it had stopped and pulled forward, and stopped again in the location where it was now resting.  Bergquist had checked the license and registration, both of which were valid, and had asked Ray to remain in the cab while he called for a CVEU.  Bergquist also told Donovan that Ray seemed confused and lost, as he was trying to get to New York City by traveling north on Route 160 toward New Hampshire. (Defs.' SMF ¶ 23; Bergquist Dep. at 8; Donovan Aff. ¶ 4; Donovan Dep. at 4-5; Defs.' Resp. SAMF ¶ 125.)  There is no dispute that it was only after Ray told Bergquist that he was going from Poland, Maine to New York that Bergquist concluded that Ray was lost and might be fatigued; Bergquist admits that he had no other reason to think or believe that Ray might have been fatigued. (Pl.'s SAMF ¶ 168; Bergquist Dep. at 36-37; Defs.' Resp. SAMF ¶ 168.)

Bergquist also told Donovan that he was scheduled to go off duty to have dinner, so after this brief conversation Bergquist left the scene at 6:54 p.m. (Defs.' SMF ¶ 23; Bergquist Dep.  at 8; Donovan Aff. ¶ 4; Donovan Dep. at 4-5; Defs.' Resp. SAMF ¶ 125.) According to the defendants, Ray was not handcuffed and in the cruiser when Donovan

arrived and he did not complain to Donovan about pain from the handcuffs.  (Defs.' Resp. SAMF ¶ 123.)

Ray, acknowledging that he does not know what was said between the two troopers,  reiterates that he was not backing south in the northbound lane but that he was going south in the southbound lane when stopped. (Pl.'s Resp. SMF ¶ 23; Ray Aff. ¶ 7.) He protests that he was not confused or loss, but had simply missed a turn. (Pl.'s Resp. SMF ¶ 23; Ray Aff. ¶ 5.) According to Ray, Bergquist never left the scene.  (Pl.'s Resp. SMF ¶ 23; Ray Aff. ¶ 34; Pl.'s SAMF ¶ 125.)   In Ray's version of events, when Donovan arrived he spoke outside the police car for a while with Bergquist. Then Donovan got in the front seat of the cruiser and Ray was sitting in the back. Ray immediately began to complain to Donovan that the handcuffs were too tight, were cutting into his wrists and were causing him severe pain. Donovan, Ray asserts, ignored Ray's complaints and pleas for help, and just questioned him about his truck and his load, although Ray continued to complain about the handcuffs and the pain in his wrists to Donovan.  Bergquist was on the scene throughout this time. (Pl.'s SAMF ¶ 123; Ray Aff. ¶ 32.)

Donovan has been trained in the North American Standard Safety Course part of which deals with recognizing fatigued or ill drivers.  (Defs.' SMF ¶ 27; Pl.'s Resp. SMF ¶ 27.)   According to Donovan, based upon his years of experience in dealing with commercial drivers, Donovan came to the conclusion that Ray was a fatigued driver. In making a decision to arrest Ray for being a fatigued driver Donovan, utilizing his years of experience noted that (a) Ray was confused and headed north on Route 160 when his stated destination was far to the south in Brooklyn, New York, (b) he had been backing a

15

60 foot tractor trailer rig that was 8'10" wide southbound in a northbound lane that was only 10' wide, (c) Ray's log book indicated that in the last eighteen hours he slept only two hours, and (d) when asked when he had had his last good sleep, Ray replied that his last good sleep had been in North Carolina. (Defs.' SMF ¶ 28; Donovan Dep. at 8-10, 15, 18; Defs.' Resp. SAMF ¶¶ 97, 127)   The page in Ray's log book for September 10, 1999, covered a 24 hour period beginning at midnight on September 10th. (Ray Dep. (continued) at 93.) His log book indicated that he had been in North Carolina on September 9, 1999,   -- the defendants do not specify what hour Ray left North Carolina -- the day before he encountered Troopers Bergquist and Donovan. (Defs.' SMF ¶ 91; Donovan Aff. ¶ 7.) After deciding that Ray was a fatigued driver, Donovan decided to arrest him because Ray was insistent that he had a delivery to make the next morning in Brooklyn, New York, so it was unlikely that he would voluntarily stay out of service if not arrested, and given the rural location where they were, there was no place for the tractor trailer to be parked, where Ray could get a meal, or have toilet facilities to use. (Defs.'s SMF ¶ 29; Donovan Dep. at 10, 38.)  Donovan had lived in the area where Ray was stopped for many years and was very familiar with it; there was no place headed north along Route 160, the direction in which the tractor trailer was pointing, where it could be parked safely off the road until it was across the border into the State of New Hampshire. (Defs.' SMF ¶ 30; Donovan Dep. at 16-18.)[9]

Ray retorts that, while Donovan gave him a citation for being a fatigued driver, he was not, in fact, fatigued and points out that Donovan, having arrived an hour after the stop, never saw Ray drive.  (Pl.'s Resp. SMF ¶ 28; Ray Aff. ¶¶ 26, 37l; Pl.'s SAMF

---

[9]     Ray retorts that whatever was north of the location was irrelevant as he was trying to proceed south.  (Pl.'s Resp. SMF ¶ 30; Ray Aff. ¶ 41.)

¶¶ 127, 128, 168.)[10]  Ray stresses that he was not in fact confused but had merely missed

his turn, (Pl.'s Resp. SMF ¶ 28; Ray Aff. ¶ 5; Pl.'s SAMF ¶ 96); he was not backing in the

northbound lane but was backing in the southbound lane (Pl.'s Resp. SMF ¶ 28; Ray Aff.

¶ 6); although he had slept only two hours in the last eighteen hours he had plenty of  rest

during that eighteen hours when he was not driving, and he was not tired at all (Pl.'s

Resp. SMF ¶¶ 28, 29; Ray Aff. ¶¶ 6, 38; Pl.'s SAMF ¶ 97).    Ray thinks that Donovan

asked him when his last "good sleep" was as a trick question to justify an arrest,

explaining that he had slept eight hours since leaving North Carolina but did not consider

that "good sleep" because he slept in his berth rather than in a nice comfortable bed.

(Pl.'s Resp. SMF ¶ 28; Ray Aff. ¶¶ 38; Pl.'s SAMF ¶ 129.)  With respect to the September

9, 1999, entry in his log book, Ray asserts that it shows that he slept eight hours after he

left North Carolina but that the defendants never gave him his log book back[11] so he

cannot look up where this sleep occurred.  He also contends that his log book shows that

after he slept he rested for several hours on September 9 and 10.  He feels as though he

was well rested when he was stopped.  (Pl.'s Resp. SMF ¶ 91; Ray Aff. ¶¶ 75, 76; Pl.'s

SAMF ¶¶ 166, 167.)   Ray argues that under federal law he should have been allowed to

drive his truck to the nearest safe place to park it rather than leaving it on the road.  (Pl.'s

Resp. SMF ¶ 29; Ray Aff. ¶¶ 39; Pl.'s SAMF ¶ 130.)[12]  He contends that if Donovan had

told him that he was too fatigued to drive he would have driven to the nearest motel to get

---

[10]       The defendants assert that Ray's response to Paragraph 28 does not address the facts set forth in
their paragraph.  (Obj. Pl.'s Resp. SMF 28.)  I disagree that Ray's subjective assertion that he was not in fact
fatigued is not at all probative of whether Donovan drew the correct conclusion on this score.
[11]       The defendants respond to this assertion by citing to a non-cognizable additional statement of fact.
(Defs.' Resp. SAMF ¶ 166.)  The defendants do not attempt to illuminate the question of what exactly the
September 9 entries reflected; they are oddly silent on the point, almost suggesting an intentional
obfuscation on their part, especially given the fact that they were the parties that produced a copy of the
September 10 log book.
[12]       The defendants object to the portion of this response that is a legal conclusion (Obj. Pl.'s Resp.
SMF ¶ 29) and I assure them that I have not relied on Ray's interpretation of federal law.

some sleep just as an appeasement to the troopers.  (Pl.'s Resp. SMF ¶ 29; Ray Aff. ¶¶ 40; Pl.'s SAMF ¶ 131.)

There is no genuine dispute that at the time Ray displayed his log book, it was not current to his last change of duty status. (Defs.'s SMF ¶ 31; Ray Dep.(continued) at 106; Pl.'s Resp. SMF ¶ 31.) Ray's log book was complete only until 7:15 a.m. and he brought it current after he encountered Donovan and Bergquist. (Def.'s SMF ¶ 31; Ray Dep. at 25; Ray Dep. (continued) at 93; Donovan Dep. at 19; Pl.'s Resp. SMF ¶ 31; Ray Aff. ¶¶ 18, 42.)  Ray was also arrested by Donovan for failing to have his log book current, (Defs.' SMF ¶ 32; Donovan Dep. at 24), although Ray protests by contending that as he had brought his log book current before the arrest it was not legal for Donovan to arrest him (Pl.'s Resp. SMF ¶ 32; Ray Aff. ¶¶ 18, 24; Pl.'s SAMF ¶ 133.).[13]

According to the defendants, while Donovan was still present at the scene on Route 160 a Motor Carrier Compliance Report was completed, indicating that the driver was "out-of-service" for eight hours. Donovan contends that he reviewed the contents of that report with Ray shortly after it was completed at 7:15 p.m. and had him sign it. The Motor Carrier Compliance Report shows that the vehicle was not rendered out-of-service as that portion of the form is not checked off. (Defs.' SMF ¶ 33; Pl.'s Ex. 5; Defs.' Resp. SAMF ¶ 124.)  Ray responds that his only conversation with Donovan pertained to information about his truck and load; there was no joint review of any Motor Carrier Compliance Report.  He also states that he did not sign the report that evening but signed

---

[13]    Again, the defendants object to the portion of this response that is a legal conclusion (Obj. Pl.'s Resp. SMF ¶ 32; Defs.' Resp. SAMF ¶ 133) and, again, I assure them that I have not defaulted to Ray's interpretation of law.

it and other papers when he was released from jail. (Pl.'s Resp. SMF ¶ 33; Ray Aff. ¶ 33; Pl.'s SAMF ¶ 124.)[14]

According to the defendants, Donovan did not place the vehicle out-of-service. Had there been a co-driver, that person could have continued on with the rig and load to make the delivery, but Ray was alone. Since Ray was placed out-of-service, it was necessary to call a towing service to have his vehicle towed to a location where it would not interfere with traffic and where it could be stored safely and securely. (Defs.' SMF ¶ 34; Donovan Aff. ¶ 6.) At 6:58 p.m. Donovan asked the dispatcher to have Hartford's Towing come to the scene to tow the tractor trailer. Shortly thereafter, at 7:22 p.m., he asked the dispatcher to request that Bergquist return to the scene to transport Ray to the York County Jail while he awaited the arrival of the tow truck. (Defs' SMF ¶ 35; Donovan Aff. ¶ 6.)   Bergquist was recalled to the scene by his barracks which informed him that Donovan wanted him to return to the scene to transport "an arrested subject." (Defs.' SMF ¶ 36; Bergquist Dep. at 8; Defs.' Resp. SAMF ¶ 124.)

 Ray qualifies, stating that the fact is that Donovan arrested him without probable cause and impounded his truck for three days.  He reiterates his assertion that federal law provides that he should have been allowed to drive his truck off the road to the nearest safe place to park it.  (Pl.'s Resp. SMF ¶ 34; Ray Aff. ¶¶ 39, 63, 64; (Pl.'s SAMF ¶ 155.)[15] Ray maintains that Bergquist never left the scene so he could not have been called back. (Pl.'s Resp. SMF ¶¶ 35, 36; Ray Aff. ¶ 34; Pl.'s SAMF ¶ 125.)

[14]      Ray also adds that the defendants had his truck moved to an impound lot where it was impounded for three days.  He had to pay $450 for the return of his truck.  (Pl.'s Resp. SMF ¶ 33; Ray Aff. 63.)  He believes that this assertion is a denial of the statement: "The Motor Carrier Compliance Report shows that the vehicle was not rendered out-of-service since that portion of the form is not checked off."
[15]      The defendants  complain that this response to Paragraph 34 does not set forth facts which dispute those set forth by the defendants and it also contains a contention of law which should be stricken.  (Obj. Pl. Resp. SMF ¶ 34.)  Although I have not relied on Ray to set forth the true nature of the law I do not agree that the defendants' paragraph should be deemed admitted.

As the defendants tell it, at the time of the arrest Donovan explained to Ray the violations for which he was being arrested -- being a fatigued driver and failure to have his log book current -- and he had Ray sign three traffic summonses indicating the violations for which he was being arrested. The third summons was issued to the motor carrier under whose authority Ray was operating, BR Transport, Inc. (Defs.'s SMF ¶ 37; Donovan Dep. at 28-29; Defs.' Resp. SAMF ¶ 126.)  Ray denies this version of the facts and asserts that Donovan did not explain anything to him, telling him only that Ray was going to jail.  Ray asked why he was being arrested and on what charges but Donovan refused to tell him.  Ray then asked Bergquist why he was being arrested and on what charges and Bergquist refused to respond.   He asserts that he did not sign the citations at the scene but did this when he was released from jail.  (Pl.'s Resp. SMF ¶ 37; Ray Aff. ¶¶ 35, 43; Pl.'s SAMF ¶¶ 124, 126, 134.)   As the defendants point out in objecting to this response by Ray, Ray testified at his deposition that he signed the citations on the night of his arrest at the York County Jail.  (Ray Dep. (continued) at 105; see also Obj. Pl.'s Resp. SMF ¶ 37.)

### The Handcuffing and Transport

According to the defendants, at 7:23 p.m. Bergquist received a call from the dispatcher directing him to return to the scene in order to transport Ray to the York County Jail as he had been or was about to be arrested by Donovan. (Defs.' SMF ¶ 38; Bergquist Aff. ¶ 16.)  At 7:33 p.m. he arrived back on the scene where Donovan and Ray were located, the tractor trailer was still parked in the same place as when he had left, and Donovan's cruiser was parked behind it with the blue lights activated.  Donovan informed Bergquist that he had arrested Ray on two charges, being a fatigued driver and failure to

have his log book current. (Defs.' SMF ¶ 39; Bergquist Aff. ¶ 16. )  Donovan asked

Bergquist to transport Ray to the York County Jail. While Bergquist was at the scene

Donovan explained the charges and the tickets to Ray and had him sign three

summonses: one charged Ray with failure to have his log book current (Pl.'s Ex. 8), one

charged him with being a fatigued driver (Pl.'s Ex. 9), and one charged BR Armstrong

Transport, Inc. with allowing the operation of a vehicle with a driver whose log book was

not current (Pl.'s Ex. 6). (Defs.' SMF ¶ 40; Bergquist Aff. ¶ 16.)

     Ray responds with his contention that Bergquist never left the scene so he did not

re-arrive at the scene as described by the defendants. (Pl.'s Resp. SMF ¶¶ 38, 39; Ray Aff.

¶ 34.)  He reiterates that his tractor trailer was always stopped facing north in the south

bound lane where he had been backing up.  (Pl.'s Resp. SMF ¶ ¶ 39; Ray Aff. ¶ 50.)

Donovan, Ray insists, never explained the charges and the tickets to him  -- in or out of

Bergquist's presence-- despite Ray's request to both troopers for an explanation.  (Pl.'s

Resp. SMF ¶ 40; Ray Aff. 35.)[16]

---

[16]    There are a series of factual to-and-fros that may or may not be a reiteration of previously set forth facts concerning the review of Ray's documents.  They are as follows.

    According to the defendants, Donovan reviewed his form entitled Motor Carrier Compliance Report with Ray and had Ray sign that document. (Defs.' SMF ¶ 41; Pl.'s Ex. 5; Bergquist Aff. ¶ 16; Defs.' Resp. SAMF ¶¶ 124, 136.)  Donovan asked for and reviewed various documents that Ray was required by Federal and State Law to carry with him as a Commercial Vehicle Driver. Among those documents was a medical card certifying that he was physically qualified to operate a motor vehicle in Interstate Commerce. (Defs.' SMF ¶ 42; Donovan Dep. at 10; Defs.' Resp. SAMF ¶ 137.)  Donovan did not examine Ray's long form physical documentation, which is a copy of a doctor's physical form. (Defs.' SMF ¶ 43; Donovan Dep. at 10-11. )

    According to Ray, Donovan never reviewed the Motor Carrier Compliance Report form with him and he did not sign the form at the scene but did so upon his release from jail.  (Pl.'s Resp. SMF ¶ 41; Ray Aff. ¶ 45; Pl.'s SAMF ¶¶ 124, 136.) Donovan did not ask Ray for the documents as Ray had already given all of his papers to Bergquist.  (Pl.'s Resp. SMF ¶ 42; Ray Aff. ¶ 46; Pl.'s SAMF ¶ 137.) While Ray admits that Donovan reviewed at least some of those papers (see Pl.'s Resp. SMF ¶ 25; Obj. Pl.'s Resp. SMF ¶ 42) (he is not sure whether Donovan reviewed his long form physical form (Pl.'s SAMF ¶ 138)); for his part, Ray maintains, Bergquist refused to look at the physical form.  (Pl.'s Resp. SMF ¶¶ 42, 43; Ray Aff. ¶¶ 46, 47; ((Pl.'s SAMF ¶ 138 )  As set forth in their objection to Ray's response to Paragraph 41, the defendants stress that Ray testified that he signed the compliance report during his intake at the jail on the evening of his arrest.  (Ray Dep. (continued) at 106-07; Obj. Pl.'s Resp. SMF ¶ 41; Defs.' Resp. SAMF ¶ 124.)

According to Bergquist he applied the handcuffs as he had been trained to do. Bergquist asked Ray to put his arms behind him, he immediately did so with his right hand, and Bergquist applied handcuffs to his right wrist. (Defs.' SMF ¶¶ 45, 48; Ray Dep. (continued) at 98-100; Pl.'s Resp. SMF ¶ 48; Defs.' Resp. SAMF ¶¶ 112, 145.)  Per Bergquist, in response to Bergquist's asking him to put his left arm behind his back for cuffing, Ray told the trooper only that his "arm was messed up and that if he put the cuffs on it there was going to be a problem." (Defs.' SMF ¶ 48; Defs.' Resp. SAMF ¶ 112; Ray Dep. (continued) at 99-100; <u>see also</u> Obj. Pl.'s Resp. SMF ¶ 45.) There is no dispute that after being asked several times to put his left arm behind his back he did so. (Defs.' SMF ¶ 48; Pl.'s Resp. SMF ¶ 48.) Indeed, according to the defendants, Ray was at all times cooperative, and it was not necessary to use any force whatsoever in order to apply the handcuffs. (Defs.' SMF ¶ 45; Ray Dep. (continued) at 98-100; Defs.' Resp. SAMF ¶¶ 112, 145.) Once the handcuffs were applied Bergquist checked them for fit to make sure that they were not too tight by placing one of his fingers between the handcuffs and Ray's wrists. He also took the precaution of double locking the handcuffs which assured that they could not become any tighter during the course of the transport from the scene to the York County Jail. (Defs.' SMF ¶ 45; Bergquist Aff. ¶ 17.)  Ray, the defendants assert, was then placed in the front seat of his cruiser. (Defs.' SMF ¶ 45; Bergquist Dep. at 9-10.) Bergquist describes Ray as having been calm and cooperative throughout the entire process so that Bergquist was not required to use any physical force to take him into custody other than routine placing of handcuffs on his wrists. At no time did Bergquist use any degree of physical force more than reasonably necessary, nor did he use more physical force than he believed was necessary. (Defs.' SMF ¶ 59; Bergquist Aff. ¶ 25.)

Ray responds by stating that he told Bergquist that his left wrist was damaged and begged him not to put the cuff on that wrist but he did not fight him.  (Pl.'s Resp. SMF ¶¶ 45, 48; Ray Aff. ¶¶ 21, 26; Pl.'s SAMF ¶¶ 112, 144.)  According to Ray, Bergquist responded by telling Ray to give him his left hand or he would be charged with resisting arrest and never get out of jail. (Pl.'s Resp. SMF ¶ 48; Ray Aff. ¶ 26; Pl.'s SAMF ¶¶ 117, 118, 145.)[17]  Ray contends that it was unnecessary to handcuff him at all. (Pl.'s SAMF ¶ 146; Ray Aff. ¶ 55.)  Ray describes the handcuffs as being too tight from the moment that Bergquist put them on and he immediately began complaining of this.  (Pl.'s Resp. SMF ¶ 45; Ray Aff. ¶ 22; Pl.'s SAMF ¶¶ 113, 144, 145.)  Whether or not the cuffs were double locked, Ray experienced them as too tight, they were hurting his wrists the entire time they were on, and Ray continually complained to Bergquist that they were too tight and hurting him. (Pl.'s Resp. SMF ¶ 45; Ray Aff. 23; Pl.'s SAMF ¶¶ 114, 144.)  Ray contends that he was placed in the back, not the front, seat of the cruiser.  (Pl.'s Resp. SMF ¶ 45; Ray Aff. 24; Pl.'s SAMF ¶ 115 )  Ray adds that he does not remember whether his hands were cuffed in front or behind him but assumes that they must have been behind him, otherwise he would have been able to look at his wrists while his handcuffs were on.  He was not able to look at his wrists until the handcuffs were off at which point it was obvious that his left wrist was swollen and bleeding and that the handcuffs had made indentations all around the circumference of his right wrist.  (Pl.'s Resp. SMF ¶¶ 47; Ray

---

[17]        Again, the defendants want me to strike any reference (this time to) Bergquist's statements because Ray made no mention of these statements when asked about the handcuffing process during his deposition testimony.  (Obj. Pl.'s Resp. SMF ¶ 48.)  Again, I note that this is the type of omission /contradiction that can be utilized on cross examination at trial but in a summary judgment context -- in which I draw all reasonable inferences in Ray's favor -- I will not find as a fact that Bergquist did not make these statements because Ray did not mention this in his deposition.  (It would be another matter if Ray affirmatively testified at his deposition that Bergquist did not threaten him with arrest and indefinite jail time.)  I take the same approach with the defendants' objections to Ray's response to Paragraphs 49, 54, 55, 57, and 84 and the defendants' response to Ray's additional facts in Paragraphs 116, 117, 118. 119, 120, 123, 144, 146, 152, 158, 160.  (See also Pl.'s SAMF ¶ 157; Defs.' Resp. SAMF ¶ 157.)

Aff. ¶ 25; Ray Dep. at 73 – 74; Pl.'s SAMF ¶¶ 116, 158.)[18] When Ray was being handcuffed by Bergquist, he did not know where Trooper Donovan was, he was not within Ray's line of vision, and immediately before the cuffing, he was not in the vicinity where Ray and Bergquist were. (Defs.' SMF ¶ 46; Pl.'s Resp. SMF ¶ 46.)

There is no dispute that the only physical evidence of the pre-existing left wrist condition Ray claims existed at the time he was handcuffed was a very minor, barely visible scar on the wrist. Even if one looked for it, it would have been barely visible. (Defs.' SMF ¶ 49; Pl.'s Resp. SMF ¶ 49.)  Ray adds that because this was true concerning the lack of the wrist condition visibility he told Bergquist over and over again that his left wrist was damaged and would be severely harmed by the cuffing.  (Pl.'s Resp. SMF ¶ 49; Ray Aff. ¶¶ 27, 53; Pl.'s SAMF ¶¶ 144, 145, 146.)  According to the defendants, at no time at the scene did Ray complain of any difficulty with the handcuffs, of any pain related to them, or that they were too tight. (Defs.' SMF ¶ 51; Bergquist Dep. at 24; Bergquist Aff. ¶ 17; Donovan Dep. at 27-28; Defs.' Resp. SAMF ¶¶ 113, 144, 145, 146.) Ray retorts that from the time the cuffs were applied until the time that they were taken off he complained that they were too tight and that they were causing pain to his wrists, especially the left.  (Pl.'s Resp. SMF ¶ 51; Pl.'s SAMF ¶¶ 113, 119.)

According to Bergquist, his cruiser did not have a cage between the front seat and the back seat and all state trooper prisoners are transported in the front seat of the cruiser. (Defs.' SMF ¶ 52; Bergquist Dep. at 10; Defs.' Resp. SAMF ¶¶ 115, 139.)   At the time of

---

[18]        The defendants want me to strike any reference to bleeding in this responsive paragraph because Ray made no mention of bleeding during his deposition testimony.  (Obj. Pl.'s Resp. SMF ¶ 47.)  Again, this is the type of omission/contradiction that can be utilized on cross examination at trial but in a summary judgment context -- in which I draw all reasonable inferences in Ray's favor  -- I will not find as a fact that Ray's wrist were not bleeding because he did not mention this in his deposition.  (It would be another matter if Ray affirmatively testified that his wrist was not bleeding.)

the arrest it was normal practice both to handcuff an individual, and place him or her in the front seat of the cruiser because the cruisers had no cages between the front and the rear seats. (Defs.' SMF ¶ 53; Donovan Dep. at 28; Bergquist Aff. ¶ 18; Defs.' Resp. SAMF ¶¶ 115, 139.) Ray reiterates his contention that, whatever the "normal practice," he was placed in the back of the cruiser.  (Pl.'s Resp. SMF ¶¶ 52, 53; Pl.'s SAMF ¶ 139.)

According to Bergquist he left the scene on Route 160 en route to the York County Jail at 7:44 p.m.; by that time Ray had been in handcuffs for approximately two minutes. (Defs.' SMF ¶ 54; Bergquist Aff. ¶ 18; Donovan Aff. ¶ 11.) The defendants opine that Ray does not know how long he was at the scene on Route 160 after he was placed in the cruiser before departing for jail, nor does he know how long it took to get to the jail. They contend that he was placed in the cruiser immediately after being handcuffed. (Defs.' SMF ¶ 55; Ray Dep.(continued) at 98, 107, 109; Defs.' Resp. SAMF ¶¶ 120, 140.)  Ray responds that by the time Bergquist drove him from the scene he had been handcuffed for about an hour.  (Pl.'s Resp. SMF ¶¶ 54, 55; Ray Aff. ¶ 49; Pl.'s SAMF ¶¶ 120, 140.)  He states that Bergquist did place him in the cruiser immediately after handcuffing him but he had to then wait for Donovan to arrive. (Pl.'s Resp. SMF ¶ ¶ 55; Ray Aff. ¶ 29; Pl.'s SAMF ¶ 120.)

According to Bergquist, the ride to the York County Jail was uneventful. (Defs.' SMF ¶ 56; Bergquist Aff. ¶ 19; Defs.' Resp. SAMF ¶ 147.)  According to Ray, the ride was not uneventful as he was constantly complaining about the pain in his wrists; Bergquist, says Ray, told Ray, "I should have shot you back there when I had a chance, so I wouldn't have to listen to your whining."  (Pl.'s Resp. SMF ¶ 56; Ray Aff. ¶ 52; Pl.'s SAMF ¶¶ 142, 147.)   Bergquist does not recall any complaints from Ray about the

handcuffs causing him injury or pain during the trip to the jail. (Defs.' SMF ¶ 59; Bergquist Dep. at 26; Bergquist Aff. ¶ 19; Defs.' Resp. SAMF ¶¶ 142, 147)    At no time, insists Bergquist, did he express any sentiment about wishing he had shot Ray. (Defs.' SMF ¶ 60; Bergquist Aff. ¶ 19; Defs.' Resp. SAMF ¶¶ 143, 147.)

Once again, Ray fires back that, as described above, he incessantly told Bergquist that his left wrist was damaged and would be harmed by the cuffing but Bergquist ignored his pleas, instead threatening him with a charge of resisting arrest and an indefinite stay in jail.  (Pl.'s Resp. SMF ¶¶ 57, 59, 60; Ray Aff. ¶¶ 52, 53, 56; Pl.'s SAMF ¶¶ 142, 143, 144, 147.)[19]   He also represents that he tried to show Bergquist his long-form physical document but Bergquist refused to look at it.  (Pl.'s Resp. SMF ¶ 58; Ray Aff. ¶ 54; Pl.'s SAMF ¶ 138.)   In Ray's view he did not need to be handcuffed in the first place and, in the second place, Bergquist could have listened to his pleas and applied the cuffs more loosely.  (Pl.'s Resp. SMF ¶ 59; Pl.'s SAMF ¶¶ 142, 146.)

According to the defendants, neither Bergquist nor Donovan was ever informed of any injuries or damage to either of Ray's wrists at any time when they were interacting with him. Neither of Ray's wrists had any deformity or scarring that were obvious at the scene, or at any time later in the evening. At no time did Ray make any mention of having any sort of infirmity, disability, or injury to his wrists, hands, or arms; Bergquist did not observe any type of deformity, infirmity, disability, or injury when he was placing the handcuffs. Neither their observations, nor any information they were provided from

---

[19]      There is some irony/hypocrisy apropos the defendants' objection to Ray's response to Paragraph 59 of their statement of fact.  The defendants assert that the statements  -- that Bergquist did not need to handcuff Ray and that he should not have been arrested in the first place -- are opinions and not facts.  (Obj. Pl.'s Resp. SMF ¶59.)  Yet the defendants' Paragraph 59 includes the statement: "At no time did Bergquist use any degree of physical force more than reasonably necessary, nor did he use more physical force than he believed was necessary."

any source gave them any indication that routine handcuffing could not be done to Ray. (Defs.' SMF ¶ 57; Bergquist Aff. ¶¶ 20, 25; Donovan Aff. ¶ 10; Bergquist Dep. at 23-24; Defs.' Resp. SAMF ¶¶ 142, 147.)  Bergquist contends that he examined only Ray's license and registration; neither of those documents had any information indicating that Ray suffered from any injuries or infirmities that would dictate against the use of handcuffs in the usual manner.  (Defs.' SMF ¶ 58; Bergquist Aff. ¶¶ 25-26.)  Bergquist and his prisoner arrived at the York County Jail at 8:11 p.m., after taking the most direct route between the arrest scene and the jail.  (Defs.' SMF ¶ 56; Pl.'s Resp. SMF ¶ 56.)

### At the York County Jail

There is no genuine dispute that it was the practice of the York County Jail to inquire of an arrested person, before he is admitted to the jail, whether or not that person has any injuries. In the event that the arrested person or the officer transporting him or her indicates that the person is injured, admission to the jail will be refused until medical clearance is obtained.  (Defs.' SMF ¶ 61; Bergquist Dep. at 58-59: McCormick Dep. at 78; Pl.'s Resp. SMF ¶ 61.)  In the event an inmate were to be admitted with an injury, when it was discovered by jail officers or reported by the inmate, it was the policy of the jail to call in its medical personnel. (Defs.' SMF ¶ 62; McCormick Dep. at 79.)[20]  After driving into what is referred to as the "sally port" at the jail, a door is locked behind the officer and the arrestee, and a correctional officer comes out to meet them. The correctional officer asks the prisoner whether he or she is injured in any way. The purpose is to make sure that the arrestee is not injured or needed treatment at that time.

---

[20]      Ray indicates that he does not know what the policy of the jail is but asserts that no medical staff looked at his wrists even though he complained at the jail that the handcuffs were too tight and that they were damaging his wrists.  (Pl.'s Resp. SMF ¶ 62.)

(Defs.' SMF ¶ 63; Stacy Dep. at 9, 60-61; Bergquist Dep. at 68-69; Bergquist Aff. ¶ 22; Donovan Dep. at 45; Donovan Aff. ¶9.)[21]

According to the defendants, prior to being allowed into the jail, Ray was personally questioned by one of the York County Corrections Officers. Among other questions he was asked whether or not he was injured in any way and he replied in the negative.  (Defs.' SMF ¶ 64; Bergquist Dep. at 59-60, 64; Bergquist Aff. ¶ 22; Defs.' Resp. SAMF ¶ 148.)  According to Ray, the correctional officer behind the counter asked him many questions.  He told the officer that his wrists were in pain, especially his left wrist, because of the handcuffs.  He complained of the pain continuously until the cuffs were taken off.  He also told the officer that his heart was bad, he had a missing lung, and that there was a bullet in his spine.  (Pl.'s Resp. SMF ¶ 64; Ray Aff. ¶ 60; Pl.'s SAMF ¶ 148.)

According to the defendants, shortly after entering the York County Jail the handcuffs on Ray were removed from him by a York County Corrections Officer and returned to Trooper Bergquist. This took place around the time that Bergquist was completing the Prisoner Safe Keeping Record at about 8:20 p.m.  They state that Ray was not placed in any other handcuffs during the time Bergquist was present in the York County Jail. Bergquist left the York County Jail and reported to his dispatcher that he was available for duty between 8:28 and 8:31 p.m. When he left the jail he had the handcuffs that he had used on Ray in his possession as he was going back out on patrol. (Defs.' SMF ¶ 65; Bergquist Dep. at 29-30; Bergquist Aff. ¶¶ 21,23; Defs.' Resp. SAMF ¶ 148.)

---

[21]      Ray responds that he does not recall any correctional officer coming out to meet him at the sally port; he thinks he was taken into a counter at the jail where there was a correctional officer waiting.  (Pl.'s Resp. SMF ¶ 63.)  I note the dispute but I fail to see how it is material to any of Ray's claims.

Ray recalls that when Bergquist's cuffs were taken off another set was put on him. (Pl.'s Resp. SMF ¶ 66; Ray Aff. ¶ 61.)   Ray has no idea how long he had been at the jail before the handcuffs were removed from him. He did not look at the jail clock and has no means of disputing that Bergquist left the jail with his own handcuffs within about twenty minutes of his arrival. (Defs.' SMF ¶ 66; Pl.'s Resp. SMF ¶ 66)(emphasis added).   Ray cannot say with certainty whether or not the handcuffs placed on him by Bergquist were the same handcuffs that were on him for the entire time that he was in the York County jail, but he believes that once the first pair of cuffs was removed, no others were applied. (Defs.' SMF ¶ 67; Pl.'s Resp. SMF ¶ 67.)   He remembers being in handcuffs for what seemed like about two hours after he was brought to the jail. (Pl.'s SAMF ¶ 152.)   The defendants point out that Ray testified at his deposition that he had "no idea" how long his handcuffs had been on before their removal, he had not consulted the jail clock, and he had no means of disputing that Bergquist left the jail with his own set of cuffs within twenty minutes of his arrival.  (Defs.' Resp. SAMF ¶ 152.)

According to the defendants, Ray claims only that his left wrist was swollen when the handcuffs were removed and the swelling went down within a day or two; his right wrist was not swollen, but had an indentation where the cuff had been applied. He has never sought medical treatment for either wrist. (Defs.' SMF ¶ 72; Ray Dep. (continued) at 38; Ray Dep. Exhibit 2, Resp. No. 25; Defs.' Resp. SAMF ¶ 149.)   Ray adds that although the swelling went down in his left wrist a day or two later, he still has pain in his wrist today from this incident.  Additionally the original pre-arrest incision has spread from the swelling and pressure.  (Pl.'s Resp. SMF ¶ 72; Ray Aff. ¶ 58.)  He states that when he was able to look at his wrist after the handcuffs were removed it was very

obvious that his left wrist was swollen and bleeding, and that the handcuffs had left indentations all the way around his right wrist.  He complained that his wrists were swelling and in pain. (Pl.'s SAMF ¶ 116; Ray Aff. ¶ 25; Pl.'s SAMF ¶¶ 148, 149.)

On September 10, 1999, Kevin McCormick was the booking officer in the York County jail when Ray arrived.  (Defs.' SMF ¶ 83; Pl.'s Resp. SMF ¶ 83.) According to these defendants, one of McCormick's duties was to observe the condition of new inmates and when he personally observed Ray, he saw no noticeable scars, Ray did not appear to be in pain, and was cooperative. (Defs.' SMF ¶ 84.)   McCormick asserts that he also asked Ray if he had any scars, and Ray revealed none. (Defs.' SMF ¶ 85; McCormick Dep. at 22.)[22]  McCormick asked Ray if he was injured and Ray replied that he was not. Had McCormick seen swollen wrists he would have contacted medical personnel. (Defs.' SMF ¶ 86; McCormick Dep. at 81- 82; Defs.' Resp. SAMF ¶ 148; Defs.' Resp. SAMF ¶¶ 151, 160.)  According to McCormick, the handcuffs with which the inmate was secured on his way to the jail are removed at the time an inventory of the inmate's personal property is taken; this is done, at least in part, because it is the prisoner who removes his personal items from his pockets. Ray's inventory was taken at approximately 20:17. (Defs.' SMF ¶ 87; McCormick Dep. at 58-59, 82-83; Plaintiff's Exhibit 30.)  York County jail personnel (in general) did not place inmates in a holding cell while they were wearing handcuffs, the cuffs were removed before such a placement was made. (Defs.' SMF ¶ 88; McCormick Dep. at 67-68; Defs.' Resp. SAMF ¶ 162.)

With respect to the McCormick Affidavit dependent statements, Ray denies that McCormick could see no scars and was unaware of his pain; he insists that his left wrist

---

[22]     In response to Ray's countering statement the defendants assert that regardless of whether or not McCormick actually asked Ray if he had any scars Ray revealed none.  (Defs.' Resp. SAMF ¶ 159.)

was swollen and bleeding, his right wrist had indentations all the way around its circumference, and numerous times he had told both Bergquist and McCormick that he was in extreme pain. (Pl.'s Resp. SMF ¶ 84; Ray Aff. ¶ 67; Pl.'s SAMF ¶ 151.) He states that McCormick never asked him if he had any scars and, in fact, Ray had numerous scars on his body. (Pl.'s Resp. SMF ¶ 85; Ray Aff. ¶ 68; Pl.'s SAMF ¶ 159.) Ray contends that McCormick never asked him if he was injured. Rather, Ray complained to him on numerous occasions that the handcuffs were hurting his wrists, especially his left wrist. Neither Bergquist nor McCormick did anything to relieve Ray's wrist pain and McCormick did not contact any medical personnel. (Pl.'s Resp. SMF ¶ 86; Ray Aff. ¶ 69; Pl.'s SAMF ¶¶ 148, 160.) Ray states that he does not recall the exact time that his property was inventoried but thinks it was probably an hour or two after he entered the jail. (Pl's Resp. SMF ¶ 87; Ray Aff. ¶ 70; Pl.'s SAMF ¶¶ 153, 161.) Ray is not sure what the actual practice is supposed to be but asserts that he was put in the holding cell with handcuffs on. (Pl.'s Resp. SMF ¶ 88; Ray Aff. ¶ 71; Pl.'s SAMF ¶ 162.)

### *Seizure of Property*

The defendants contend that Ray's vehicle was never impounded; it was not taken out of service by either Donovan or Bergquist. (Defs.' SMF ¶ 73; Donovan Dep. at 36, 47; Defs.' Resp. SAMF ¶¶ 154, 155.) Ray responds by stating that these two defendants had his truck taken to the impound lot and would not tell him where it was. When Ray finally discovered where it was after he got out of jail Ray had to pay $450 to get the truck back. (Pl.'s Resp. SMF ¶ 73; Ray Aff. ¶ 63; Pl.'s SAMF ¶¶ 154, 155.) After being released from the York County jail, Ray drove his rig to New York where he was paid for the trip without any penalty for the delay in delivery. (Defs.' SMF ¶ 90; Ray Dep. at 26.)

31

On this score Ray states that this is true but he missed his next load and the shipper of the next load told him that he would never let Ray carry anything again because he had not shown up to pick up the load or called to let the shipper know that he would be late. (Pl.'s Resp. SMF ¶ 90; Ray Aff. ¶ 73; Pl.'s SAMF ¶ 164.)

### Ray's Claim of Racial Motivation

Asked to state the basis for his contention that Bergquist and Donovan acted with malicious intent toward him because of his race as set forth in Paragraph 27 of the amended complaint, Ray replied:

> See response to Interrogatories 5, 7, 9, and 11 above. In addition, it was obvious from the way the defendants treated me, that they were treating me that way because I was black. Their conduct was so outrageous that it was clear they would not have treated me that way if I had not been black.

(Defs.' SMF ¶ 78; Pl.'s Resp. SMF ¶ 78.)  According to the defendants Ray's interrogatory responses 5, 7, 9, 11, and 17 are devoid of facts tending to show that Ray's race played any role whatsoever in his treatment by these two defendants. (Defs.' SMF ¶ 79; Ray Dep. Ex. 2, Resp. Nos. 5, 7, 9, 11, 17; see also Obj. Pl.'s Resp. SMF ¶ 79.)  Ray counters that the facts set forth in those interrogatory answers make it clear that no human being would treat another human being that way.  He believes that Donovan and Bergquist thought that he was something less than a human being because of his race. (Pl.'s Resp. SMF ¶ 79; Ray Aff. ¶ 65; Pl.'s SAMF ¶ 156.)

### Ray's Evidence of a Finding of No Probable Cause

Ray asserts that Justice of the Peace Michael O'Toole concluded that Ray was arrested without probable cause and ordered that he be released from jail. Ray complains that he was not released from jail for more than forty-eight hours after he went in.  (Pl.'s

SAMF ¶ 169; Ray Aff. 77.)  His record evidence for this assertion is a copy of a

handwritten note that states:

> Ray, Don dob 4/21/53
> arrested 9/10/99 @ 2017
> Logbook violation; Fatigued
> Driver
> Maine State Police (Donovan)
> No Affidavit
> No Probable Cause
> To be released on or
> before 9/12/99 @ 2017

(Pl.'s Ex. 32.)   It is signed by Michael O'Toole, Justice of the Peace, 9/12/99 10:12. He

also attaches a section of a deposition by David Stacey in which Stacey discusses this

exhibit with respect to the decision at the jail as to when to discharge Ray.  (Stacey Dep.

at 72-73.)[23]   Ray further asserts that the District Attorney dismissed the criminal charges

against him because he had no evidence to prove that he had committed either alleged

offense. When the District Attorney dropped the charges, Superior Court Justice

Fritzsche, in open Court on the record, apologized to Ray and suggested that he may want

to consider pursuing civil claims for violation of his constitutional rights against the

defendants for what they did to Ray.  (Pl.'s SAMF ¶ 170; Ray Aff. ¶ 78.)   Ray's record

evidence for this assertion is a transcript of a July 21, 2005, hearing in which Fritzsche

does make this suggestion.  (July 21, 2005, Tr. at 5.)

 The defendants respond that, as to Plaintiff's Exhibit 32 there is no evidence of

record to identify the document or its author, arguing that it violates the hearsay rule of

Federal Rule of Evidence 801. (Defs.' Resp. SAMF ¶ 169.)[24]   With respect to the

---

[23]     This note has also been submitted as an exhibit by the other two defendants in their separate summary judgment pleadings.

[24]     The defendants have an additional statement of fact in an attempt to counteract the inference that there was no probable cause but, as stated earlier, these additional facts by the movant are not cognizable.

evidence pertaining to the July 21, 2005, hearing the defendants assert that the charges were dismissed because of staleness but their only support for this assertion is a cross reference to a non-cognizable movant statement of additional fact and support exhibits.  I also note that a complete reading of that transcript does not indisputably support the defendants' assertion that the only reason for the disposition was that the charges were stale; the justice went so far as to remark: "But something like that, if that's accurate, and you have been consistent in stating what happened, that kind of behavior, if that occurred from the police, is totally wrong and should not have taken place.  So you're free to go, sir, thank you very much for returning."  (July 21, 2005, Tr. at 6.) The defendants also contend that the copy of the transcript violates the hearsay rule of Federal Rule of Evidence 801.  Considering Ray's pro se status I reject this basis for disregarding a facially valid copy of a transcript that is certified by the presiding official court reporter.

### *Ray has Alleged and Defended Five Constitutional Claims against these Defendants*

After reviewing Ray's amended complaint, Donovan's and Bergquist's fair extrapolation of the claims apropos them contained in Ray's first Fourteenth Amendment count, I conclude that there are five constitutional claims against Donovan and Bergquist:[25] One, a Fourth Amendment claim that he was stopped without probable

---

[25]     There are facts in this record that address Ray's assertion that his currency was seized and confiscated without due process.  The facts relevant to this claim are as follows.

While Ray's property was being inventoried at the jail before Trooper Bergquist departed, the handcuffs had already been removed because Ray was the one removing his property from his own pockets. (Defs.' SMF ¶ 68; Bergquist Dep.  at 60-61; Pl.'s Resp. SMF ¶ 68; Defs.' Resp. SAMF ¶ 153.)  The defendants contend that the inventory was taken at approximately 20:17, only six minutes after Bergquist and Ray arrived at the York County Jail. (Defs.' Resp. SAMF ¶ 161.) Ray asserts that, whether or not Bergquist was there during the inventory, his property was not inventoried until a long time after he entered the jail.  (Pl.'s Resp. SMF ¶ 68; Ray Aff. ¶ 62; Pl.'s SAMF ¶¶ 153, 161.)

There is no genuine dispute that at no time did Bergquist see, handle, or come into possession of any of Ray's coins or currency or any other items of his personnel property. The only items of his personnel property that he ever handled were Ray's license and the registration of his vehicle, both of which were returned to him on Route 160 where the tractor trailer was parked. (Defs.' SMF ¶ 69; Pl.'s Resp. SMF ¶ 69.)  At no time did Donovan have in his possession any of Ray's coins or currency or any other

cause; two, a Fourth Amendment claim that he was arrested without probable cause; three, a Fourth Amendment claim that these defendants used excessive force vis-à-vis their participation in the handcuffing of Ray; four, that his truck and water cargo were impermissibly seized in violation of his Fourth Amendment protection against unreasonable seizure of property; and five, Ray was arrested because of his race and the defendants violated his Fourteenth Amendment rights to equal protection.[26]   As already noted, Ray also has an "attorney fees" count.

**Pre-arrest Stop and Detention**

The defendants contend that Ray was not "stopped" by Bergquist but that Ray had stopped on his own accord when Bergquist arrived and stopped his car without deploying his flashing lights.  Inferring in Ray's favor that he was actually "stopped" by Bergquist, I agree with the defendants that the record supports the conclusion that Bergquist was

---

items of his personal property other than the documents he reviewed. He has no knowledge of what property was taken from Ray during the course of the inventory or any other time while he was present in the York County Jail. (Defs.' SMF ¶ 70; Pl.'s Resp. SMF ¶ 70.)

Ray does not remember any of his personal property or clothing being taken from him prior to the point at which the handcuffs were removed. (Defs.' SMF ¶ 74; Pl.'s Resp. SMF ¶ 74.)  The people who told Ray to empty his pockets and wallet and went through his wallet were people wearing deputy sheriff uniforms. (Defs.' SMF ¶ 75; Pl.'s Resp. SMF ¶ 75.) The last time that Ray saw his money, including what he claims were rare and valuable currency and coins, it was on the counter in the York County Jail; what happened to it after that he has no idea. (Defs.' SMF ¶ 76; Pl.'s Resp. SMF ¶ 76.) Ray is claiming that the Sheriff's Office took his valuable money and gave him only the face value back.  (Defs.' SMF ¶ 77; Pl.'s Resp. SMF ¶ 77.)

Ray's linkage of these two defendants to the alleged confiscation of his rare currency is attenuated. At most Bergquist may have seen the money when he was present at the jail.  Even assuming that Bergquist may have played a more significant part in handling the currency, the deprivation of that right was "random and unauthorized" within the meaning of Parratt v. Taylor, 451 U.S. 527 (1981) and Hudson v. Palmer, 468 U.S. 517 (1984), even in the aftermath of Zinermon v. Burch, 494 U.S. 113 (1990), at least as the First Circuit Court of Appeals applies these cases, see Hadfield v. McDonough, 407 F.3d 11, 20-21 (1st Cir. 2005); Mard v. Town of Amherst, 350 F.3d 184, 193-94 & n.4 (1st Cir. 2003); Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525, 534-37 (1st Cir. 1995);  Fenton v. Pellitier, Civ. No. 03-281-PH, 2004 WL 2278772, *3 & n.1  (D.Me. Oct. 5, 2004).

[26]     As noted in the portion of this decision above that discusses Ray's motion to amend his complaint, these defendants, although they object to the motion to amend because it does not meet the procedural/time requirements for the amendment, did discern these claims as tenable in setting forth their grounds for summary judgment.  The defendants went so far as to try to discuss a sixth claim, some sort of Fourteenth Amendment seizure of personal liberty claim; they are right in arguing that the proper analysis for adjudicating this claim is under the jurisprudence of Fourth Amendment seizure, made applicable to these state actors through the Fourteenth Amendment.

undertaking a community caretaking function when he 'stopped' Ray and proceeded to investigate the situation, and this caretaking function also embraced Bergquist's decision to await Donovan's arrival on the scene.  See Cady v. Dombrowski, 413 U.S. 433, 441 (1973); United States v. Rodriguez-Morales, 929 F.2d 780, 784 -88 (1st Cir. 1991).  Ray concedes that at the time Bergquist came upon him he was backing about a quarter of a mile, a considerable distance on a road that is narrow given the size of Ray's vehicle. Ray did have to wait for the arrival of Donovan and he contends that the latter half of this fifty minutes was in Bergquist's car.[27]

**Probable Cause to Arrest**

Section 15(B) of title 17-A of the Maine Revised Statutes Annotated authorizes arrest for Class E crimes committed in an officer's presence.[28]  Furthermore: "If an officer

---

[27]     Ray claims that he was handcuffed while in Bergquist's car awaiting Donovan and that when Donovan arrived he was sitting in Bergquist's cruiser and Donovan spoke to Bergquist and then got into the cruiser to speak with Ray.  Ray does not contend that he was under arrest at that point.  Assuming Ray's version is accurate, it seems to me that given the need for Donovan's expertise before a decision could be made about whether an arrest was appropriate, Bergquist did not exceed the bounds of reasonable conduct while awaiting Donovan's arrival.

[28]     Ray argues with the force of some logic that since no arrest was made until Donovan arrived on the scene, there was no authority to make the arrest because even if there was probable cause to believe that Ray had operated the vehicle as a fatigued driver that operation was not committed in Donovan's presence. Donovan's remedy was to present his probable cause to a judicial officer and obtain an arrest warrant if he believed Ray's arrest was necessary.  Neither side has provided any Maine cases that might explain how 17-A M.R.S.A. § 15 (B) applies to this sort of factual matrix where one officer observed the conduct in his presence but waited for a "second" opinion before any arrest was made.  Bergquist, although not the ultimate decision maker on the arrest, was the observing officer, the transporting officer, and the "co-arresting" officer.  In the absence of case law to the contrary, I conclude that the arrest complied with § 15(B),if there was probable cause, because the perceived violation conduct was clearly committed in Bergquist's presence.  See State v. Ronan, 380 A.2d 207, 210 (Me. 1977) (approving jury instruction suggesting misdemeanor was committed in the presence of the officer notwithstanding that the officer may have failed to perceive through his own senses all of the facts constituting the crime).  Even if there were a technical violation of a state statute that does not mean that there was a constitutional violation unless the officer lacked probable cause for the arrest.  The probable cause determination in this case was essentially a legal conclusion made by Donovan based upon what he was told by Bergquist and Ray, his visual observations of Ray, and his review of a log book.  If the court disagrees with my recommendation finding support for the legal conclusion of probable cause for the arrest on these essentially undisputed facts, then the legal conclusion is that the arrest was made without probable cause and is therefore in violation of the constitution.  In that case Donovan claims he is entitled to qualified immunity under the third prong of qualified immunity analysis because for any objectively reasonable officer the presence of probable cause would be arguable or subject to legitimate question.  See Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992).

has probable cause to believe that an individual has committed <u>even a very minor</u> <u>criminal offense</u> in his presence, he may, without violating the Fourth Amendment, arrest the offender." <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001) (emphasis added). Donovan contends that he made the decision to arrest Ray because he concluded he was a fatigued driver. Pursuant to 26-A M.R.S.A. § 558 and 49 C.F.R. § 395.8, Donovan was empowered to make this choice. <u>See also</u> <u>United States v. Maldonado</u>, 356 F.3d 130, 132 -34 (1st Cir. 2004).[29]

On the record before me, it is a little puzzling why Donovan would make this decision as Ray's explanation for why he was backing his truck viewed in the context that Ray was doing so very shortly after the intersection where he allegedly made his miss-turn makes Ray's version of events quite credible. However tempting it might be, a federal district court is not the correct forum to second guess a state trooper's decision to effect what is otherwise a lawful probable cause arrest, even if the decision seems in hindsight to have been an incomprehensible one. Indeed, the Supreme Court referenced the lack of historical evidence of "comparably foolish, warrantless misdemeanor arrests" <u>Atwater</u>, 532 U.S. at 353, when upholding the probable cause arrest of a mother for failing to wear her seat belt and failing to fasten her children in seat belts. In Ray's case

---

[29]    This CFR provides:
        No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle. However, in a case of grave emergency where the hazard to occupants of the commercial motor vehicle or other users of the highway would be increased by compliance with this section, the driver may continue to operate the commercial motor vehicle to the nearest place at which that hazard is removed.

49 C.F.R. § 392.3.
        Donovan also argues that he had grounds to arrest Ray because his log book was not current in that it had not been updated since 7:00 that morning. Ray apparently brought his log book current prior to the arrest (Ray asserts that he did so prior to Donovan's arrival on the scene) and there is no dispute that he did do so accurately. At a minimum the summary judgment record creates a dispute of fact that would preclude using the log book arrest as the basis for granting summary judgment to the defendants.

the officer was empowered to make a probable cause arrest of a fatigued driver, and even taking the disputed facts and resolving them in Ray's favor, there are enough circumstances here to support a finding of probable cause for the arrest.  The fact that the officer failed to reduce those facts to affidavit form in order to present them to the state justice of peace within forty-eight hours of the arrest does not mean that the arrest itself was in violation of the Fourth Amendment.

### Excessive Force in Handcuffs Application and Maintenance

The defendants' first line of attack on Ray's excessive force claim is that Ray has not stated a claim because his injury was minor and involved a preexisting condition and "the allegations demonstrate no more than the 'degree of physical coercion,' Graham [v. Connor], 490 U.S. [386,] 396 [(1989)], typically attendant to an arrest." Pena-Borrero v. Estremeda, 365 F.3d 7, 12 (1st Cir. 2004).  Pena-Borrero's complaint alleged vis-à-vis the excessive force claim that "the officers threatened to break down the door and gates to gain entry to his home, used foul language, and pushed both of [his] arms up behind his back up to almost his neck, whereby plaintiff told them that they were hurting him." Id.  As a consequence, Pena-Borrero re-injured his ribs near his chest which had been fractured due to a prior car accident and his back was also injured where he has three herniated discs.  Id.  The First Circuit's opinion in that case supports the defendants' argument here. [30]

However, in Bastien v. Goddard the First Circuit explained:

> Although the severity of the injury also may be considered, see,
> e.g., Dean v. City of Worcester, 924 F.2d 364, 369 (1st Cir.1991), we have
> stated explicitly that a "serious injury" is not a prerequisite to recovery:

---

[30]   See also  McPherson v. Auger, 842 F. Supp. 25, 30 (D. Me.1994) with McDermott v. Town of Windham, 204 F.Supp.2d 54, 65 (D. Me. 2002).

> [A] trialworthy "excessive force" claim is not precluded merely
> because only minor injuries were inflicted by the seizure. See
> Lester [ v. Chicago], 830 F.2d [706,] 714 [ (7th Cir.1987) ]
> (finding reversible error in district court "excessive force"
> instruction which required jury to find "severe injury," thus may
> have led jury to find for defendant where plaintiff's physical
> injuries consisted only of bruises); see also Harper v. Harris
> County, 21 F.3d 597, 600 (5th Cir.1994) (holding that plaintiff
> need not prove "significant injury" to assert Fourth Amendment
> "excessive force" claim).

Alexis [v. McDonald's Rests. of Mass.], 67 F.3d [341,] 353 n. 11 [(1st Cir.
1995)]. That view is widely held. See, e.g., Kostrzewa v. City of Troy, 247
F.3d 633, 639 (6th Cir.2001) (excessive force claims can be maintained
regardless of whether injuries "left physical marks or caused extensive
physical damage," including, as in that case, when individual's wrists are
cuffed too tightly); Glenn v. City of Tyler, 242 F.3d 307, 314 (5th
Cir.2001); Headwaters Forest Defense v. County of Humboldt, 240 F.3d
1185, 1199 (9th Cir.), vacated and remanded on other grounds by 534 U.S.
801 (2001) ( "[W]hether the use of force poses a risk of permanent or
significant injury is a factor to be considered in evaluating the need for the
force used in a particular case-but it is certainly not dispositive.");
Lambert v. City of Dumas, 187 F.3d 931, 936 (8th Cir.1999) (circuit has
rejected the "significant injury" requirement for excessive force claims,
requiring instead "actual injury"); Rambo v. Daley, 68 F.3d 203, 207 n. 2
(7th Cir.1995) (significant injury not required for Fourth Amendment
excessive force claims); Wardlaw v. Pickett, 1 F.3d 1297, 1304 n. 7
(D.C.Cir.1993) (severity of injury a "relevant factor," but "we do not
suggest that an individual must suffer significant injuries in order for the
force used to be unreasonable").

279 F.3d 10, 14 -15 (1st Cir. 2002) (footnotes omitted).

Bastien clearly holds that a police officer may be held liable under the Fourth

Amendment with respect to a handcuffing even in the absence of serious injury.

Resolving factual disputes in Ray's favor the summary judgment record would support a

conclusion that Bergquist in particular, but also Donovan, ignored Ray's persistent pleas

to loosen the handcuffs because they were causing him serious pain and injury.  The facts

concerning the handcuffing and transportation in Bastien are not materially

distinguishable; when he was placed in handcuffs Bastien immediately told the officer

that the handcuffs were too tight and were causing him pain, yet no adjustments were

made and additional harm occurred during transport due to bouncing around during

transport. See 279 F.3d at 12 & n.2. Thus, following Bastien on this record it would be

logical to conclude that dispute of material fact exists as to the question of whether or not

there is a constitutional violation.

However, after the parties had finished briefing this motion, another panel of the

First Circuit has weighed in on this question of handcuffing and the use of excessive

force during an arrest.  In Calvi v. Knox County, the Court addressed, among other

issues, a handcuffing excessive force claim in which the defendant, Officer Smith, who

placed the handcuffs on the plaintiff was told by the plaintiff's landlord prior to the

handcuffing that the plaintiff should be treated gently because she had just undergone

elbow surgery.   __ F.3d __, __, 2006 WL 3546776, *1 (1st Cir. Dec. 11, 2006).  Smith

"placed Calvi in handcuffs and double-locked them behind her back so that they would

not tighten. He then marched her outside, deposited her in his cruiser, and belted her in

for transport to the Knox County jail."  Id.

> When handcuffing Calvi and assisting her into the back seat of the
> cruiser, Smith, who had been trained as a paramedic, did not observe any
> debilitating condition. He did notice, however, that Calvi was crying
> during the five-to-six-minute drive to the jail. All in all, Calvi was
> handcuffed for no more than fifteen minutes.  Smith's fellow officer,
> Sergeant Jeffrey McLaughlin, was at the scene but had no real interaction
> with Calvi; McLaughlin spent his time talking with Warren and Hayden.

Id. at *2.   The Panel reasoned:

> Counts 1 and 4 of Calvi's complaint allege in substance that the
> Rockland police officers used excessive force when handcuffing Calvi. In
> order to prevail on such a claim, a plaintiff must establish that the
> defendant's actions in handcuffing her were objectively unreasonable in
> light of the circumstances and the facts known to the officer at the time.
> See Graham v. Connor, 490 U.S. 386, 397 (1989); Isom v. Town of

Warren, 360 F.3d 7, 10-11 (1st Cir.2004); see also Alexis v. McDonald's Rest. of Mass., Inc., 67 F.3d 341, 352 (1st Cir.1995). This showing must take into account the reasonableness of the officer's actions, viewed from the perspective of a prototypical officer confronted with the same or similar circumstances. Graham, 490 U.S. at 396. All of the attendant facts must be considered. See id. Police work is often carried out in fast-moving and poorly defined situations, so it is especially unfair to judge an officer's actions in hindsight. See id. at 396-97.

  Applying this framework, it is readily apparent that the entry of summary judgment in Sergeant McLaughlin's favor is unimpugnable. There is not a shred of evidence that McLaughlin had anything to do with Calvi's handcuffing. His mere presence at the scene, without more, does not by some mysterious alchemy render him legally responsible under section 1983 for the actions of a fellow officer. See Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n. 3 (1st Cir.1990).

  The case against Smith is slightly more robust--but not robust enough to fend off summary judgment. Smith was responding to news that a civilian had been brandishing a knife in a dangerous manner. Even if Smith knew that the knife-wielder, Calvi, had a hand deformity, there is no evidence that he applied any excessive force. Standard police practice called for cuffing an arrestee's hands behind her back and Smith's decision not to deviate from this practice was a judgment call, pure and simple. He handcuffed Calvi in the customary manner and kept her in handcuffs for no more than the time reasonably necessary to transport her to the lockup. That is the end of the story. The totality of the circumstances affords no legally sufficient basis for a finding that Smith's handcuffing of Calvi represented a constitutionally proscribed use of excessive force. Cf. Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir.2001) (concluding that officer did not use excessive force in pushing suspect to the ground and kneeling on her back, notwithstanding the suspect having complained of preexisting injuries). Accordingly, the district court did not err in granting summary judgment for Smith.

Id. at *4 -5 (footnote omitted). [31]

  Ray does not dispute that the preexisting scar on Ray's left wrist was not obvious.

He does protest that he told Bergquist of this injury, that he tried to get him to look at his

---

[31]  In a footnote pertaining to McLaughlin's liability the Panel explained:
  To be sure, a bystander-officer who has a realistic opportunity to prevent the use of excessive force by a fellow officer may in certain circumstances be held liable for a failure to intervene. See, e.g., Martinez v. Colon, 54 F.3d 980, 985 (1st Cir.1995) (explaining that "police officers sometimes have an affirmative duty to intervene that is enforceable under the Due Process Clause"); Gaudreault, 923 F.2d at 207 n. 3 (similar). Here, however, Calvi did not timely charge McLaughlin with a failure to intervene.
Id. at 4 n.3.

physical form, that he insisted the handcuffs would cause him injury and pain, and that he continued to tell Bergquist of his discomfort during the transport. Ray does point to record evidence that he persisted in telling Bergquist of his injury and the pain from the handcuffing and insisted that they were too tight, especially when placed in the context of the entirely undisputed fact that Ray was at all times entirely cooperative with the defendants. Prior to the issuance of <u>Calvi</u> the question of whether, drawing reasonable inferences in Ray's favor, there was a constitutional violation was a more difficult call.[32] In the aftermath of <u>Calvi</u>, with its parenthetical reliance on <u>Jackson v. City of Bremerton</u>, 268 F.3d 646, 653 (9th Cir.2001), I conclude that Ray's claim does not survive summary judgment on the question of whether there was a constitutional violation apropos his handcuffing by Bergquist.[33]

---

[32]     Prior to <u>Calvi</u> the excessive force/handcuffing concern was even more painful to resolve when one examined the diversity of facts and holdings in other circuits. <u>See, e.g.,</u> <u>Kenyon v. Edwards</u>, 462 F.3d 802 (8th Cir. 2006); <u>Lyons v. City of Xenia</u>, 417 F.3d 565, 575 -76 (6th Cir. 2005); <u>Rodriguez v. Farrell</u>, 294 F.3d 1276, 1277 -79 (11th Cir. 2002); <u>Glen v. City of Tyler</u>, 242 F.3d 307, 314 (5th Cir. 2001); <u>compare</u> <u>Gilles v. Davis</u>, 427 F.3d 197, 207 -08 (3d Cir. 2005); <u>Kopec v. Tate</u>, 361 F.3d 772 (3d Cir. 2004); <u>see</u> <u>also</u> <u>Martin v. Heideman</u>, 106 F.3d 1308, 1312 -13 (6th Cir. 1997).

[33]     My lingering concern vis -à-vis this conclusion pertains only as to the question of whether Ray's assertion that he continued to complain to Bergquist about the handcuffs on his lengthy transport to the jail crosses a dividing line between constitutional handcuffing like that in <u>Calvi</u> and handcuffing that amounts to excessive force.

        However, the defendants have also asserted that they are entitled to qualified immunity.
              Qualified immunity is a judge-made doctrine created to limit the exposure of public officials to damages actions, thereby fostering the effective performance of discretionary functions in the public sector. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 807 (1982). The reach of this doctrine is long, but not infinite. It protects all but "the plainly incompetent [and] those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As that exclusion has been interpreted, the doctrine does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful. <u>Davis v. Scherer</u>, 468 U.S. 183, 193 (1984); <u>Surprenant v. Rivas</u>, 424 F.3d 5, 14 (1st Cir.2005).
              Relying on Supreme Court precedent, <u>see, e.g.,</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 200-02 (2001), we have developed a three-step algorithm for the determination of whether a state actor is entitled to qualified immunity. <u>See</u> <u>Limone</u>, 372 F.3d at 44. In sequential order, "[w]e consider (i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." <u>Id.</u>

From my conclusion that Bergquist did not use excessive force in his application of the handcuffs, it follows that Donovan, who Ray claims should have intervened in Bergquist's excessive force, is not liable for a failure to intervene, as would have presumably been the case for Defendant McLaughlin had Calvi properly pled a failure to intervene claim in Calvi, see supra footnote 31.

### The Removal and Impoundment of the Truck

It is evident that after Donovan decided to arrest Ray that the truck had to be removed from the scene; there is no dispute that the truck was long and wide and the road narrow and winding.  See Cady, 413 U.S. at  446-47; United States. v. Coccia, 446 F.3d

---

Pagan v. Calderon, 448 F.3d 16, 31 (1st Cir. 2006) (footnote omitted).

Bastien was decided in 2002.  Pena-Borrero was decided in 2004, and it is somewhat contradictory to the holding of Bastien, especially considering the twist that the latter case which involved somewhat more serious allegations of harm perished on a motion to dismiss as opposed to a summary judgment record or, in the case of Bastien, post jury verdict. The ink has not yet dried on the First Circuit's Calvi, which issued December 11, 2006.  See also Devine v. Rizzo, Civ. No. 05-220-P-S, 2006 WL 1663853, *5 (D. Me. June 14, 2006); Caron v. Hester, Civ. No. 00-394-M, 2001 WL 1568761, *2, 5-10 (D.N.H. Nov. 13, 2001).   So even if Calvi had not issued during the time that this motion was under consideration, given the state of the law in the First Circuit and the District of Maine concerning handcuffing a defendant during an arrest and for purposes of transport, Bergquist, who was principally responsible for the handcuffing and the transport, would be entitled to qualified immunity on Ray's excessive force claim.

> To determine a defendant's eligibility for qualified immunity, courts must define the right asserted by the plaintiff at an appropriate level of generality and ask whether, so characterized, that right was clearly established when the harm-inducing conduct allegedly took place. See Anderson v. Creighton, 483 U.S. 635, 639 (1987). This does not mean that a right is clearly established only if there is precedent of considerable factual similarity. See id. at 640(explaining that a general rule of constitutional law identified by precedent may clearly apply to the specific conduct at issue, even though "the very action in question has [not] previously been held unlawful"). It does mean, however, that the law must have defined the right in a quite specific manner, and that the announcement of the rule establishing the right must have been unambiguous and widespread, such that the unlawfulness of particular conduct will be apparent ex ante to reasonable public officials. See Wilson v. Layne, 526 U.S. 603 (1999); Ringuette v. City of Fall River, 146 F.3d 1, 4 (1st Cir.1998); Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 704 (1st Cir.1993). After all, qualified immunity for public officials serves important societal purposes, and it is therefore meant to protect "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Brady v. Dill, 187 F.3d 104, 115 -16 (1st Cir. 1999); Hope v. Pelzer, 536 U.S. 730, 739 (2002); see also Baldwin v. Tessier, Civ. No. 05-10898-DPW, 2006 WL 753244, *5 n.6 (D. Mass. Mar. 22, 2006).

233, 238 -41 (1st Cir. 2006); id. at 239 ("Courts, including this one, have frequently held that impoundments of vehicles for community caretaking purposes are consonant with the Fourth Amendment so long as the impoundment decision was reasonable under the circumstances. See Rodriguez-Morales, 929 F.2d 780, 786 (1st Cir.1991) (collecting cases) ...As we held in Rodriguez-Morales, whether a decision to impound is reasonable under the Fourth Amendment is based on all the facts and circumstances of a given case.").  The defendants are entitled to summary judgment on this claim.

**Equal Protection Claim**

The defendants concede: "Selective enforcement of motor vehicle laws on the basis of race is a violation of the Equal Protection Clause of the Fourteenth Amendment." Flowers v. Fiore, 359 F.3d 24, 34 -35 (1st Cir. 2004) (citing Chavez v. Ill. State Police, 251 F.3d 612, 635 (7th Cir.2001) and Whren v. United States, 517 U.S.806, 813 (1996)). "In order to prevail on his equal protection claim," Ray "must present evidence that he was treated differently from similarly situated non-African-American motorists and that the action taken against him was motivated, at least in part, by his race." Id. at 35 (citing Chavez, 251 F.3d at 635-36, 645); see also Johnson v. Crooks, 326 F.3d 995, 999-1000 (8th Cir.2003) (observing that an equal protection plaintiff must prove both discriminatory effect and purpose which, in the context of a claim is selective enforcement of traffic laws by an African-American plaintiff requires proof that similarly situated non-African-American individuals were not stopped or arrested).  Ray asserts that Donovan's and Bergquist's "conduct was so outrageous that it was clear they would not have treated me that way if I had not been black."

Ray has presented no evidence that the officers treated him any differently from similarly situated non-African-American motorists. He relies on his interrogatory responses 5, 7, 9, 11, and 17.  Theses are as follows:

> I was arrested for being a fatigued driver and for not having my log book up to date.  Under the Federal Motor Carrier Safety Regulations, these are not arrestable offenses.
> Furthermore, the Federal Motor Carrier Safety Regulations state that a driver is to be given an opportunity to bring his log book current.  I was arrested without being given that opportunity.
> I was not fatigued, and the arresting officers had no reason to believe I was fatigued.
> Finally, Justice of the Peace Michael O'Toole found that there was no probable cause for my arrest.

(Interrog. Resp. No. 5.)

> At the time the trooper began to place the handcuffs on my wrists, I informed the trooper of the existing damage to my left wrist and the fact that wearing a wrist watch for any lengthy period would cause swelling and pain.  I pleaded with the trooper to leave the handcuffs as loose as possible.  This plea was ignored, and the trooper locked the handcuffs as tight as he could.
> While on route to the York County Jail, I pleaded time and again with the trooper to loosen the handcuffs, explaining that I was in extreme pain.  The trooper ignored me, but finally responded:  "I should have killed you back there, and I would not have to be listening to this now."

(Interrog. Resp. No. 7.)

> As stated in response to Interrogatory 5, I was arrested without probable cause.  I was never told why I was being arrested, or held in jail. I was never told what my bail was set at, and given an opportunity to post bail – other than being told that if I gave the deputies all the money I had they would release me.  I was held in jail over 48 hours, and was held in jail even after the Justice of the Peace determined that there was no probable cause for my arrest.  My rare and valuable coins were taken, and substituted with regular, everyday money.  It was abundantly clear that I was arrested and jailed simply because I am black, and/or because the Defendants wanted to steal my money.

(Interrog. Resp. No. 9.)

In addition the trooper who stopped me drew his pistol for no apparent reason while he was walking behind me, and I had to talk him into putting his gun away. I was never told why I was being arrested, or jailed, although I asked numerous times. My rights were never read to me or given to me. I was kept in handcuffs for several hours, even though I complained continually that the handcuffs were too tight and were extremely painful. I was also forced to sit or lay on hard surfaces, which cause extreme pain in my back due to my bad back condition, which I continually complained of and explained to the Defendants, but they ignored me. I was strip searched and humiliated. I inquired numerous times of the Defendants as to the whereabouts of my truck and freight, but they ignored me and would not tell me where my things were.

(Interrog. Resp. No. 11.)[34]

In addition it was obvious, from the way the Defendants treated me, that they were treating me that way because I was black. Their conduct was so outrageous that it was clear they would not have treated me that way if I had not been black.

(Interrog. Resp. No. 17.)

Although Ray may have his suspicions that are understandably grounded in his personal experience of the events surrounding his arrest, Ray has not generated a dispute of material fact on his equal protection burden sufficient to survive summary judgment. Flowers, 359 F.3d at 35; see also Jeannite v. City of Haverhill, Civ. No. 04-10541-RWZ, 2006 WL 1806410, *4 (June 30, 2006).

**Attorney's Fees Count**

The First Circuit Court of Appeals does not countenance attorney's fee awards for pro se litigants. See Schneider v. Colegio de Abogados de Puerto Rico, 187 F.3d 30, 39 (1st Cir. 1999); Lovell v. Snow, 637 F.2d 170, 171 (1st Cir. 1981) (applying this rule to pro se actions under Section 1983).[35]

---

[34]   This interrogatory response contains further assertions but they do not in any way relate to these two defendants.

[35]   Ray also references "other costs of litigation." Should the court agree with this recommended disposition Ray would not be entitled to costs assessed against these defendants.

*Conclusion*

I deny Ray's third motion to amend his complaint.  (Docket No. 48.)  With

respect to Bergquist's and Donovan's motion for summary judgment I recommend that

the court grant the motion in its entirety.

NOTICE

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum,
within ten (10) days of being served with a copy thereof.  A responsive
memorandum shall be filed within ten (10) days after the filing of the
objection.

Failure to file a timely objection shall constitute a waiver of the
right to *de novo* review by the district court and to appeal the district
court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 14, 2006