UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| DONALD RAY, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil No. 05-239-P-H |
| ) | |
| KEVIN DONOVAN, et al., ) | |
| ) | |
| Defendants ) | |

### *Recommended Decision on Motion for Summary Judgment by Defendants Stacy and McCormick*

In this removed civil rights action Donald Ray, a resident of Illinois,[1] complains that on September 10, 1999, while he was driving a truck loaded with bottled water, he was stopped and arrested in Limerick, Maine. As relevant to the current motion, Ray alleges that for three days he was held at the York County Jail and while at the jail Ray was not told why he was arrested, his protestations that his handcuffs were too tight went unheeded, his money (including rare coins and silver certificates) was taken and never given back, and he was not informed that bail had been set for $500. In his amended complaint Ray sets out three counts: Count I charges that his right to due process was infringed, Count II alleges an equal protection violation, and Count III seeks attorney fees (Ray is proceeding pro se) and costs. Two of the defendants, David Stacy and Kevin McCormick, have moved for summary judgment (Docket No. 37). Also pending is Ray's third motion to amend seeking to expressly set forth counts alleging a Fourth Amendment unreasonable seizure and a Fourth Amendment use of excessive force.

---

[1] The defendants get their statement of material fact off to a good start by asserting that Ray resides in the State of Missouri, citing his complaint allegation that represents that Ray resides in Illinois. Predictably, Ray has denied this statement, citing his own summary judgment affidavit.

(Docket No. 48.) I deny the motion to amend and recommend the court grant in part and deny in part the motion for summary judgment.

## *Discussion*

### *The Summary Judgment Record*

The following statement of facts is drawn from the parties' statements of material fact in accordance with this District's summary judgment practice. See Dist. Me. Loc. R. 56; Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co. Am., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, all evidentiary disputes generated by the parties' statements have been resolved in favor of Ray. See Merchs. Ins. Co. N.H. v. U. S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). The defendants' motion should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ...[they are] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). On the other hand, Ray "may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Calvi v. Knox County, __ F.3d __, 2006 WL 3546776, *3 (1st Cir. Dec. 11, 2006) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986)).

### *The Facts*

Donald Ray was arrested by the Maine State Police in Limerick, Maine, on September 10, 1999. (Defs.' SMF ¶ 4; Pl.'s Resp. SMF ¶ 4.) Ray is a black, African-American, independent truck driver from Illinois. (Pl.'s SAMF ¶ 54; Defs.' Resp. SAMF

¶ 54.) Defendant David Stacy was a York County Sheriff's Deputy in September of 1999. He was on duty on September 10, 1999. He worked at the York County Jail and was assigned to the control room for the first half of his shift and as the intake officer for the second half of his shift. (Defs.' SMF ¶ 2; Pl.'s Resp. SMF ¶ 2.) Stacy was the intake officer who dealt with Ray at the booking counter, placed him in a holding cell, and took his money and other personal property. (Pl.'s SAMF ¶ 58; Defs.' Resp. SAMF ¶ 58.) Kevin McCormick was employed by York County and was stationed in the York County Jail as a booking officer on September 10, 1999. (Defs.' SMF ¶ 3; Pl.'s Resp. SMF ¶ 3.) McCormick took Ray from the holding cell and brought him to the booking desk where he asked Ray numerous question, watched as Stacy inventoried his personal property, made a call to the bail commissioner and found out what his bail was, and dealt with Ray until he was taken from the holding cell to a cell out back in the main part of the jail. (Pl.'s SAMF ¶ 59; Defs.' Resp. SAMF ¶ 59.)

### *The Handcuffs*

When Ray was arrested he was placed in handcuffs by one of the two state police troopers who arrested him. (Defs.' SMF ¶ 5; Pl.'s Resp. SMF ¶ 5.) The handcuffs stayed on Ray during his transport by the troopers to the York County Jail. (Defs.' SMF ¶ 6; Pl.'s Resp. SMF ¶ 6.)

The defendants represent that the handcuffs that Ray was placed in by the state trooper were the same handcuffs that were on Ray the entire time that he was at the York County Jail until they were removed and that after the handcuffs that had been placed upon Ray by the Maine State Police were removed in the jail, Ray was never placed in any other handcuffs on that day. (Defs.' SMF ¶¶ 7, 8.) Ray responds that he does not

3

recall whether the handcuffs applied by the state police trooper were the same that he had on the entire time that he was at the jail but if the trooper's cuffs were removed within twenty minutes after he got in the jail, as the trooper claims, then the jail deputies must have put a different pair of cuffs, too tightly, on him for, Ray maintains, he was cuffed for two hours at the jail. (Pl.'s Resp. SMF ¶ 8; Ray Aff. ¶¶ 5,6; Pl.'s SAMF ¶ 61.)

There is no dispute that Ray claims that he made complaints to people in uniforms at the York County Jail about his handcuffs. (Defs.' SMF ¶ 9; Pl.'s Resp. SMF ¶ 9.) The defendants contend that Ray does not know who he made the complaints to except to say that they were made "to the people that were in that room with uniforms on" and they point out that Ray did not recognize Stacy and McCormick at his deposition (Defs.' SMF ¶¶ 10, 11; Ray Dep. at 62, 70, 89, 110.) While acknowledging that he did not recognize the pair at his deposition (Pl.'s Resp. SMF ¶ 11), Ray responds that now that he knows that Stacy and McCormick were the intake officers who dealt with him at the jail he now knows that they are the ones (along with perhaps another deputy or two) to whom he complained about the overly tight handcuffs and the injuries to his wrist (Pl.'s Resp. SMF ¶ 10; Ray Aff. 5; Pl.'s SAMF ¶ 60).[2] There is no dispute that Ray does not know who took the handcuffs off him except to say "it was a person in uniform." (Defs.' SMF ¶ 12; Pl.'s Resp. SMF ¶ 12.)

According to the defendants, Ray does not know whether his hands were cuffed in front of him or behind him (Defs.' SMF ¶ 13; Defs.' Resp. SAMF ¶ 62) and, although Ray

---

[2] Ray also makes other qualifications in his responsive paragraph that are not material to this fact set forth by the defendants. The defendants contend that Ray's assertion that he now knows he did complain to these two officers contradicts his deposition testimony and ask that I strike Paragraph 60 of his statement of additional fact. (Defs.' Resp. SAMF ¶ 60.) I have not stricken this paragraph or other such responsive paragraphs about which the defendants complain in a similar vein as I find Ray's post-deposition explanation is credible.

4

claims that his arm was swollen because of the handcuffs, he did not see any swelling and never looked at his wrist or arm (Defs.' SMF ¶ 14; Ray Dep. at 67, 74). The defendants assert that Ray claims only that his left wrist was swollen when the handcuffs were removed and the swelling went down within a day or two; his right wrist was not swollen, but had an indentation where the cuff had been applied. They point out that Ray acknowledges that he has never sought medical treatment for either wrist. (Defs.' SMF ¶ 15; Ray Dep. (Volume II) at 38; Defs.' Resp. SAMF ¶ 64; Ray Dep. (Volume I) at 74.)[3]

Ray responds that, while he does not remember whether his hands were cuffed in front or behind him, he has deduced that they must have been behind him because he was not able to look at his wrists while his handcuffs were on and was only able to inspect his wrists after the handcuffs were removed. (Pl.'s Resp. SMF ¶ 14; Ray Aff. ¶ 7; Pl.'s SAMF ¶ 62.) When the handcuffs were removed Ray noticed that his left wrist was swollen and bleeding and his right wrist had indentations all around the circumference. (Pl.'s Resp. SMF ¶ 14; Ray Aff. ¶ 8; Pl.'s SAMF ¶¶ 63, 64; Defs.' Resp. SAMF ¶ 63.) He states that, while the swelling in his left wrist went down a day or two later, the pain remains, to this day, in his left wrist and the preexisting incision on his left wrist spread from the swelling and pressure. (Pl.'s Resp. SMF ¶ 15; Ray Aff. ¶ 9; Pl.'s SAMF ¶ 64.)

According to the defendants, as part of the booking process, Kevin McCormick (the booking officer) asked Ray questions and recorded his answers on documents entitled "Initial Inmate Assessment" and "Inmate Medical History." The information contained in the Initial Inmate Assessment and the Inmate Medical History is provided by the inmate and as a result of observations that the booking officer makes of the inmate.

---

[3] The defendants also cite "Defendants Bergquist and Donovan Exhibit 2, Response #25." I was unable to determine to what they are referring on the electronic docket.

(Defs.' SMF ¶ 16; McCormick Dep. at 5-8, 22; (Defs.' Resp. SAMF ¶¶ 70, 71.) According to the defendants, if Ray had come into the jail with swollen wrists, McCormick would have remembered it. (Defs.' SMF ¶ 17; McCormick Dep. at 1, 22.) The Inmate Medical History states that Ray told McCormick that he did not suffer from any traumatic injury and they assert that Ray agrees that the information contained on the Inmate Medical History is accurate. (Defs.' SMF ¶ 18; Ray Dep. Ex. 29; Ray Dep. at 108; Defs.' Resp. SAMF ¶ 65; Ray Dep. (Volume I) at 74; McCormick Dep. at 5-8, 21, 22, 81, 82; Dep. Ex. 29; Defs.' Resp. SAMF ¶¶ 66, 67.) The defendants contend that Ray told McCormick on September 10, 1999, that he, Ray, was not injured. (Defs.' SMF ¶ 19; McCormick Dep. at 81, 82; Defs.' SMF ¶ 24; Bergquist Dep. at 59-60, 64; Bergquist Aff. ¶ 22.)

Ray responds that while McCormick asked him questions he did not record Ray's answers and left out a lot of (unspecified) information Ray gave him. (Pl.'s Resp. SMF ¶ 16; Pl.'s SAMF ¶ 71; Ray Second Aff. at 16.) Ray does not recall any correctional officer asking him if he was injured. (Pl.'s SAMF ¶ 70; Ray Second Aff. ¶ 15.) Ray insists that he did, in actuality, come to the jail with a swollen and bleeding left wrist and an indentation around his right wrist. (Pl.'s Resp. SMF ¶ 17; Ray Aff. ¶ 10; Pl.'s SAMF ¶ 65.) With respect to the Inmate Medical History, Ray acknowledges that he did not have traumatic injury at the time, in that he did not have a stab wound, a broken leg, or another injury of that sort, however, his left wrist was swollen and bleeding and his right wrist was circled with an indentation due to the handcuffs. Additionally, when Ray discussed his condition with McCormick he did not know the condition of his wrists; he knew he was in pain and he told McCormick this. (Pl.'s Resp. SMF ¶ 18; Ray Aff. ¶ ¶13, 11; Pl.'s

6

SAMF ¶ 66.) Ray emphasizes that he told McCormick and Stacy continually that the handcuffs were too tight and that his wrists were in extreme pain. (Pl.'s Resp. SMF ¶ 19; Ray Aff. 12; Pl.'s SAMF ¶¶ 67, 68, 69; 70.)[4]

### *Ray's Personal Property*

During the booking process at the York County Jail, Ray was brought out to the booking counter and told to empty his pockets and put all of his personal property on the table (Defs.' SMF ¶ 25; Ray Dep. at 87; Defs.' Resp. SAMF ¶ 76); it is Ray's contention that this booking process occurred two hours after he entered the jail (Pl.'s Resp. SMF ¶ 25; Ray Aff. ¶ 20; Pl.'s SAMF ¶ 76.) There is no dispute as to the following. Ray claims to have placed coins and currency, both modern day as well as rare and valuable, on the table. (Defs.' SMF ¶ 26; Pl.'s Resp. SMF ¶ 26.) Ray also claims to have placed a knife, keys, and various papers along with his wallet on the counter. (Defs.' SMF ¶ 27; Pl.'s Resp. SMF ¶ 27.) The last time that Ray saw his personal property it was sitting on the

---

[4] As to this dispute the defendants, somewhat redundantly, incorporate by reference statements of fact set forth in co-defendants' Bergquist's and Donovan's motion for summary judgment pleadings, which are as follows.

One of McCormick's duties as booking officer on duty, was to observe the condition of new inmates and when he personally observed Ray, he saw no noticeable scars, Ray did not appear to be in pain, and was cooperative. (B&D Defs.' SMF ¶¶ 83, 84.) Regardless of whether or not McCormick actually asked Ray if he had any scars, Ray revealed none. (B&D Defs.' Resp. SAMF ¶ 159.) McCormick also asked Ray if he had any scars and Ray revealed none. (B&D Defs.' SMF ¶ 85; McCormick Dep. at 22.) McCormick asked Ray on the night he was arrested whether he was injured and Ray replied that he was not. Had the officer seen swollen wrists he would have contacted medical personnel. (B&D Defs.' SMF ¶ 86; McCormick Dep. at 81-82; Defs.' Resp. SAMF ¶ 148; B&D Defs.' Resp. SAMF ¶¶ 151, 160; Defs.' Resp. SAMF ¶ 68.)

Ray counters that he was not questioned by a correctional officer when he was allowed into the jail; he does not remember any correctional officer questioning him in any way. (Pl.'s Resp. SMF ¶ 24; Ray Aff. 14.) With respect to the McCormick affidavit dependent statements, Ray denies that McCormick could see no scars and was unaware of his pain; Ray's left wrist was swollen and bleeding, his right wrist had indentations all the way around its circumference, and he had told both Bergquist and McCormick that he was in extreme pain numerous times. (Pl.'s Resp. B&D SMF ¶ 84; Ray Aff. ¶ 67; Pl.'s SAMF ¶ 151.) He states that McCormick never asked him if he had any scars and, in fact, Ray had numerous scars on his body. (Pl.'s Resp. B&D SMF ¶ 85; Ray Aff. ¶ 68; Pl.'s SAMF ¶ 159) Ray contends that McCormick never asked him if he was injured. Rather, Ray complained to him on numerous occasions that the handcuffs were hurting his wrists, especially his left wrist. Neither Bergquist nor McCormick did anything to relieve Ray's wrist pain and McCormick did not contact any medical personnel. (Pl.'s Resp. B&D SMF ¶ 86; Ray Aff. ¶69; Pl.'s SAMF ¶¶ 148, 160; S & M Mot. Pl.'s SAMF ¶ 68; Ray Aff. ¶ 13.)

desk. (Defs.' SMF ¶ 28; Pl.'s Resp. SMF ¶ 28.) Ray has no idea what happened to his personal property after he left it on the desk. (Defs.' SMF ¶ 29; Pl.'s Resp. SMF ¶ 29.) Stacy partially filled out the inmate inventory form. (Defs.' SMF ¶ 31; Pl.'s Resp. SMF ¶ 31.)

According to the defendants, Stacy added up Ray's common currency and coins which totaled $563.95, placed the money in an envelope and placed the envelope into a secured money box. (Defs.' SMF ¶ 32; Stacy Dep. at 35; Pl.'s SAMF ¶ 82; Defs.' Resp. SAMF ¶ 82.) Stacy claims to have placed seven collectible two dollar bills into Ray's personal property box. (Defs.' SMF ¶ 33; Stacy Dep. at 36; Pl.'s SAMF ¶ 82; Defs.' Resp. SAMF ¶ 82.) Stacy asserts that he has never taken any money from the money box and has no knowledge of any county employee stealing money out of the money box. (Defs.' SMF ¶ 34; Stacy Dep. at 48-51.) McCormick contends that he did not take any of Ray's money and did not see anybody take any of Ray's money. (Defs.' SMF ¶ 35; McCormick Dep. at 57; see also Defs.' Resp. SAMF ¶¶ 77, 78.)

Ray blames Stacy for the disappearance of his valuable currency because Stacy admits that he was the intake officer who inventoried his property and required him to produce it for inspection. Ray believes that Stacy "automatically assumed responsibility" for his belongings, regardless of what eventually happened to them. (Defs.' SMF ¶ 30; Pl.'s Resp. SMF ¶ 30; Ray Dep. at 118-19.) He asserts that he not only told Stacy that the money was rare and extremely valuable but this should have been obvious to Stacy and McCormick, noting that, allegedly, both men remarked on how rare and valuable the money must be; accordingly Ray strongly suspects that it was Stacy and McCormick who took his rare money from the money box and replaced it with ordinary coins and

8

currency. (Pl.'s Resp. SMF ¶¶ 34, 35; Ray Aff. ¶ 24; Pl.'s SAMF ¶ 80.) When Ray was released he did not receive his rare coins and currency back but was given only modern coins and currency with an equal face value. (Pl.'s Resp. SMF ¶ 30; Ray Aff. ¶ 21; Pl.'s SAMF ¶¶ 60, 77.) Ray asserts that most of the money that Stacy took was not common but were rare bills and coins, which may have had a face value of $563.95, but which was worth $3,238. (Pl.'s Resp. SMF ¶ 32; Ray Aff. ¶ 22; Pl.'s SAMF ¶¶ 77, 78.) Ray does not know if Stacy placed seven of his two dollar bills into his personal property box but avers that he never got two of those two dollar bills back. Ray contends that Stacy should have placed all of his money in his personal property box rather than co-mingling it in the general prisoners' money box. (Pl.'s Resp. SMF ¶¶ 33, 35; Ray Aff. ¶¶ 23, 24; Pl.'s SAMF ¶¶ 79, 80.)

There is no dispute that McCormick admits that money place in the general prisoners' money box is commingled. (Pl.'s SAMF ¶ 81; Defs.' Resp. SAMF ¶ 81.) Stacy states that if deputies are told by a prisoner that his money is rare and valuable this money should have been placed into his personal property box. (Pl.'s SAMF ¶ 83; Defs.' Resp. SAMF ¶ 83.)

### *Bail*

The parties agree that bail was set for Ray in the amount of $250 on each of two charges, for a total of $500. (Defs.' SMF ¶ 36; Pl.'s Resp. SMF ¶ 36.) The fact that bail was set is reflected on an "offense information sheet," as well as the York County Jail Prisoners' Safekeeping Record. (Defs.' SMF ¶ 37; Pl.'s Resp. SMF ¶ 37.) According to McCormick he told Ray that his bail had been set at $500. With the Bail Commissioner's fee of $40, Ray would have had to pay $540 of the $563.95 he had. (Defs.' SMF ¶ 38;

9

Pl.'s Resp. SMF ¶ 38; McCormick Dep. at 95 – 97; Defs.' Resp. SAMF ¶¶ 59, 72.) McCormick states that Ray was told that he could make a phone call but he chose not to do so because there was no one for him to call. (Defs.' SMF ¶ 39; Ray Dep. at 68, 91.)

Ray responds that McCormick never told him that his bail had been set at $500, but, rather, he told Ray that if Ray gave them all his money they would let him go. (Pl.'s Resp. SMF ¶¶ 36, 38; Ray Aff. ¶¶ 17,18; Pl.'s SAMF ¶¶ 59, 72, 73.) Ray told McCormick that he was crazy because the money was worth several thousand dollars. (Pl.'s Resp. SMF ¶ 38; Ray Aff. ¶ 18; Pl.'s SAMF ¶ 73.) Because he was never told that he could post bail Ray never had a reason to call someone to bail him out; if he was so informed he would have made a call to the Armstrong Trucking Company (which he called to get his truck out of impound) and posted bail within an hour. (Pl.'s Resp. SMF ¶ 39; Ray Aff. ¶ 19; Pl.'s SAMF ¶ 74 .)

There is no dispute that McCormick does not specifically recall telling Ray that bail had been set. (Pl.'s SAMF ¶ 75; Defs.' Resp. SAMF ¶ 75; McCormick Dep. at 43, 95.) McCormick does assert that he tells everyone that 'comes up' when they have met bail. (Defs.' Resp. SAMF ¶ 75; McCormick Dep. at 97.)

There is no dispute that on Sunday, September 12, 1999, Justice of the Peace Michael O'Toole reviewed the charges against Ray, noted that there was no affidavit or other indication of probable cause, and stated that Ray was "to be released on or before 9/12/99 at 2017." (Defs.' SMF ¶ 40; Ex. 6; Pl.'s Resp. SMF ¶ 40.) The defendants assert that at 2013 on 9/12/99, Ray was brought to booking for release, and was released at 2032. (Defs.' SMF ¶ 41; Ex. 7.) Ray counters that he was released around 11:00 pm on September 12, after he complained over and over to the deputy on duty that his rare coins

10

and bills were not returned to him. (Pl.'s Resp. SMF ¶ 41; Ray Aff. 42; Pl.'s SAMF ¶ 84.)[5]

### *Allegation Pertaining to Ray's Race*

The defendants assert that Kevin McCormick has never treated anyone, including Ray, differently because of their race (Defs.' SMF ¶ 42; McCormick Aff. ¶¶ 3, 4; McCormick Dep. at 103, 105.) and David Stacy has never treated anyone, including Ray, differently because of their race. (Defs.' SMF ¶ 43; Stacy Aff. ¶¶ 3, 4.) To this Ray counters that he is sure that McCormick and Stacy would not have ignored his pleas that the handcuffs were too tight and were causing him extreme wrist pain, would not have placed him in a holding cell for about two hours with handcuffs still on, would not have kept from him the fact that his bail had been set and that he could be released if he posted it, and would not have deprived him of his rare money if he had not been black. (Pl.'s Resp. SMF ¶¶ 42, 43; Ray Aff. ¶ 27; Pl.'s SAMF ¶ 86.)

### *Motion to Amend*

Ray's third motion to amend seeks to expressly set forth counts for a Fourth Amendment unreasonable seizure and a Fourth Amendment use of excessive force. First, it is clear that Ray would not be able to sustain an unreasonable seizure claim against these two defendants. With respect to his excessive force claim, in his amended complaint Ray charges McCormick and Stacy with not responding to his complaint that his handcuffs were too tight during the period that he remained in cuffs during the booking process at the York County Jail. It is evident from his proposed amendment that he sees this as a failure-to-intervene excessive force claim against McCormick and Stacy

---

[5] The defendants assert that it is immaterial precisely when Ray was released and that Ray has failed to identify the deputy who released him. (Defs.' Resp. SAMF ¶ 84.)

and not one for improper attention to a medical condition of a pre-trial detainee, as it was briefed by these defendants in their motion for summary judgment. (Proposed 3d Am. Compl. ¶¶ 14, 31; Resp. M & S Mot. Summ. J. at 4 & n.1, 5. ) Ray makes it crystal clear that he is not alleging that these defendants violated his Eighth Amendment right to adequate medical care. (Resp. M & S Mot. Summ. J. at 5-6.) The operative amended complaint contains the allegation that McCormick and Stacy did not respond to his handcuffs complaint (Am. Compl. ¶ 15), but in setting forth the three counts does not make it clear what the legal theory of recovery is apropos this allegation. See Calvi, 2006 WL 3546776 at *6-7. (The defendants assumed that he was proceeding on a denial of medical care cruel and unusual punishment theory.)

The defendants object to Ray's third amendment which was filed almost a month after they filed their summary judgment motion.  As they point out, this court issued its scheduling order on January 11, 2006. The court established March 29, 2006, as the deadline for amendment of the pleadings and joinder of the parties. On March 30, 2006, one day after the deadline for amendments, Ray filed a motion to amend his complaint. The court entered an order providing that Ray should notify the court as to the name of Defendant "Doe" and that, upon doing so, the motion to amend would be granted.  Ray never took action. On June 15, 2006, the court issued an order to show cause.  Ray left this order unanswered and on July 5, 2006, the court denied the motion to amend.

I now deny Ray leave to amend his complaint to add an excessive force claim against McCormick and Stacy.  Given the above procedural history and based on their argument in their objection to the amendment, the defendants are entitled to stand their

ground. (Obj. 3d Mot. Am. at 2-5.)[6] Ray has not given the court a basis for finding good cause or excusable neglect. See Kropp v. School Union No. 44, Civ. No. 06-81-P-S, Order (D. Me. Nov. 2, 2006) (order denying motion to amend).

**Procedural Due Process Count**

*Interference with Ray's Right to Post Bail*

In responding to Ray's allegations concerning bail, the defendants are correct that it is only McCormick who is implicated by Ray's bail-related allegations. With regards to the substance of Ray's claim the defendants assert that there is no federal constitutional right to bail, citing Kelly v. Springett, 527 F.2d 1090, 1093 (9th Cir. 1975).[7] As to the possibility that his procedural due process rights were infringed, the defendants identify the determination made by the Justice of the Peace within seventy-two hours of Ray's arrest as offering a prompt post-deprivation procedure providing Ray with liberty.

Ray counters that while there may not be a constitutional right to bail, once bail was set he had a right to know the bail amount and the right to be given the opportunity

---

[6]     Even if I were to allow this amendment -- on Ray's own factual allegations and his summary judgment factual record – such an amendment might well be futile. The clearest precedent on the question suggests that Ray cannot bring a Fourth Amendment excessive force claim apropos his post-arrest treatment as a detainee at the jail but would need to proceed with an Eighth Amendment conditions of confinement claim, see Fuentes v. Wagner, 206 F.3d 335, 347 -48 (3d Cir. 2000); Rankin v. Klevenhagen, 5 F.3d 103, 105 -06 (5th Cir. 1993, and his allegations do not come near meeting the standard set forth in Hudson v. McMillian, 503 U.S. 1, 9-10 (1992); see also id. at 7 (inquiring "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm'") (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986), in turn quoting Johnson v. Glick 481F.2d 1028, 1033 (2d Cir. 1973)). The applicability of the Fourteenth Amendment to conditions of confinement claims regarding pretrial detainees and the fact that a jail riot was not implicated in the use of force might result in the standard becoming one of objective reasonableness. See Clarke v. Blais, 05-177-P-H (Rec. Dec. Dec. 12, 2006). Of course, Ray is complaining about remaining in handcuffs for two hours just after arriving at the jail which is a booking related undertaking and there might be room to argue that the Fourth Amendment standard of Graham v. Connor, 490 U.S. 386, 396 (1989) applies. See Brady v. Dill, 187 F.3d 104, 110 n. 5 (1st Cir. 1999). In any event, whichever standard might apply, the newly inked Calvi v. Knox County, __ F.3d __, 2006 WL 3546776, *4-5 (1st Cir. Dec. 11, 2006) would strongly support the conclusion that there is no excessive force claim here in any event.

[7]     The defendants also cite to Bretz v. Kelman, 722 F.2d 503, 505 (9th Cir. 1983 ) but the relevant portion of that decision was reversed and the case remanded, see 773 F.2d 1026, 1030 -32 (9th Cir. 1985).

13

to post it. He makes clear that his theory of recovery is that withholding this information deprived him of liberty without the process he was due.

Kelly v. Springett, on which the defendants rely states: "Although an accused has a Fourteenth Amendment due process right to have a state's bail system administered without caprice or discrimination, he has no absolute right to bail." 527 F.2d at 1093 (emphasis added).[8] Ray is arguing that McCormick acted capriciously and discriminatorily when he purposely did not inform Ray that bail had been set.

There is no genuine dispute that the procedure was that McCormick would inform a person in Ray's position when bail had been set. There is a genuine dispute of fact as to whether or not McCormick did properly inform Ray that bail had been set. Of course the question then becomes whether or not Ray had an adequate post-deprivation remedy even if McCormick did not inform him that he could be released by posting bail. See Hatfield v. McDonough, 407 F.3d 11, 21 (1st Cir. 2005); Brown v. Hot, Sexy and Safer Prods., Inc., 68 F.3d 525, 537 (1st Cir. 1995); Lowe v. Scott, 959 F.2d 323, 340 (1st Cir. 1992). The defendants are asserting that Ray did have such a remedy through the vehicle of the probable cause determination. I conclude that he did not have an adequate post-deprivation remedy because the fact that he was released only after forty-eight hours in jail does not cure the deprivation he claims occurred during the period when bail had been set and he, allegedly, was not properly advised of that fact.

---

[8] The defendants also cite to Stephenson v. Gaskins a case that states: "[B]ecause [Robert Lewis Stephenson's] allegations that one has been falsely imprisoned and denied bail do, on their face, state a claim for relief, a 12(b)(6) dismissal of them would be improper." 539 F.2d 1066, 1068 (5th Cir. 1976).

This is not an easy area of constitutional law to navigate. At least once, the First Circuit has viewed cases with similar facts through the fulcrum of the Eighth Amendment right to be free from excessive bail. Wagenmann v. Adams, 829 F.2d 196, 211-13 (1st Cir. 1987). However, neither party has framed this issue under the Eighth Amendment; Ray is clear that he sees the violation as being a deprivation of his liberty without due process.

14

*The Rare Coins*

Ray also faults these defendants for their involvement in improperly handling his rare currency, conduct that, one way or the other, has resulted in stripping Ray of his property. The defendants argue that Ray's linkage of these two defendants to the alleged confiscation/conversion of his rare currency is attenuated. In defense, Ray avers that both of these defendants remarked on the value of his currency when the money was turned over to prison authorities. Ray asks the court to speculate that McCormick and/or Stacy had designs on the currency and one or both of them orchestrated a scheme in which regular currency from the pocket(s) of McCormick and/or Stacey was exchanged for Ray's valuable currency whilst Ray was being detained.[9] Assuming Ray's hypothesis is true there is no dispute that the defendants were not following proper procedure when they substituted this currency. If I were to infer that one or both of these defendants took some of Ray's valuable currency their act was "random and unauthorized" within the meaning of Parratt v. Taylor, 451 U.S. 527 (1981) and Hudson v. Palmer, 468 U.S. 517 (1984). Ray's course of redress was, post-deprivation, and through state law. Hatfield, 407 F.3d at 21; Brown, 68 F.3d at 537; Lowe, 959 F.2d at 340; see also Fenton v. Pellitier, Civ. No. 03-281-PH, 2004 WL 2278772, *3 & n.1 (D.Me. Oct. 5, 2004). Thus, even if I assume that Ray has presented sufficient circumstantial evidence of theft by McCormick and/or Stacy, the summary judgment record does not support the conclusion that a constitutional violation occurred.

---

[9] The evidence that Ray musters in regard to this claim may ultimately be admissible, in any event, if any portion of this case proceeds to trial. It may be argued that this evidences McCormick's presumed motive in withholding the information from Ray regarding his bail status.

15

### *Bail and Coins and Ray's Invocation of the "Shock the Conscience" Standard*

Ray also argues that McCormick's failure to so inform Ray coupled with the alleged efforts to extort his rare currency "shocks the conscience."  This language seems to invoke the Fourteenth Amendment substantive due process standard.  As to Ray's invocation of the "shock the conscience" standard with respect to his bail and coins, I am confident that under First Circuit case law he cannot sustain such a claim on his own version of the facts at this summary judgment stage.  See Brady v. Dill, 187 F.3d 104, 107 -15 (1st Cir. 1999); Thompson v. Olson, 798 F.2d 552, 558 -59 (1st Cir. 1986) (relying on Shillingford v. Holmes, 634 F.2d 263 (5th Cir.1981)); see also DePoutot v. Raffaelly, 424 F.3d 112, 119 -22 (1st Cir. 2005); Cummings v. McIntire, 271 F.3d 341 (1st Cir. 2001).

**Equal Protection Count**

The defendants did not separately brief an argument as to why they are entitled to judgment on Ray's equal protection count.  With respect to his articulation of this count against these two defendants, Ray insists that if he was not black McCormick and Stacy would not have ignored his pleas that the handcuffs were too tight and were causing him extreme wrist pain, would not have place him in a holding cell for about two hours with handcuffs still on, would not have kept from him the fact that his bail had been set and that he could be released if he posted it, and would not have deprived him of his rare money.

"[T]o make out a prima facie [equal protection] case the plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position."

16

Hilton v. City of Wheeling, 209 F.3d 1005, 1008 (7th Cir. 2000). Given the contours of Ray's claims against these two defendants, his showing would require that he generate some admissible evidence that the defendants would have treated non-African-American detainees differently apropos the bail and property. See Campbell v. Sheahan, Civ. No. 94-2937, 1998 WL 25188, *9 (N.D.Ill. Jan. 9, 1998) (bail related equal protection claim) ("Different treatment on the basis of race, on the other hand, can violate the Constitution, but [the plaintiff] has offered no evidence tending to show that the … defendants would have treated a white prisoner materially differently than they treated [the plaintiff."); cf. Johnson v. Crooks, 326 F.3d 995, 999-1000 (8th Cir.2003) (observing that an equal protection plaintiff must prove both discriminatory effect and purpose which, in contexts of a claim is selective enforcement of traffic laws by an African-American plaintiff requires proof that similarly situated non-African-American individuals were not stopped or arrested). Ray's conclusory assertions that there can be no other explanation for the way he was treated do not hurdle the summary judgment burden of proof for his equal protection violation claim. See Calvi, 2006 WL 3546776 at *2-3 (observing that defeating summary judgment "requires more than the frenzied brandishing of a cardboard sword"; '"a conglomeration of 'conclusory allegations, improbable inferences, and unsupported speculation' is insufficient to discharge the nonmovant's burden.'")(quoting DePoutot, 424 F.3d at 117, in turn quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990)).

**Custom and Policy Concern**

To the extent that Ray's amended complaint alleged that the York County Jail should be held liable because there was a custom and policy that led to his alleged

17

constitutional violations,[10] Ray had failed to generate a genuine dispute of material fact as to the defendants' statement of facts pertaining to such a claim. (See Defs.' SMF ¶¶ 21, 22, 23, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53;  Pl.'s Resp. SMF ¶¶ 21, 22, 23, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53.)  Not one of his additional statement of facts supports such a claim. (See Pl.'s SAMF ¶¶ 54-86) and Ray admits that he does not know what the practice of the York County Jail is with respect to intake and such (Pl.'s SAMF ¶¶ 68,69).

**Attorney's Fees Count**

The First Circuit Court of Appeals does not countenance attorney's fee awards for pro se litigants.  See Schneider v. Colegio de Abogados de Puerto Rico, 187 F.3d 30, 39 (1st Cir. 1999); Lovell v. Snow, 637 F.2d 170, 171 (1st Cir. 1981) (applying this rule to pro se actions under Section 1983).[11]

### *Conclusion*

I deny Ray's third motion to amend his complaint. (Docket No. 48.)  With respect to McCormick's and Stacy's motion for summary judgment I recommend that the court grant it in part but deny summary judgment only as to McCormick on the claim that he unconstitutionally interfered with Ray's ability to post bail by arbitrarily and capriciously withholding from him the necessary information concerning his bail status.

### NOTICE

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum,
within ten (10) days of being served with a copy thereof.  A responsive

---

[10] The defendants have briefed this issue out of caution.  It would be fair to read Ray's complaint as not raising a custom and policy claim at all.

[11] Ray also references "other costs of litigation."  Whether or not he is entitled to costs, as opposed to attorney fees, as to the one outstanding claim is a question that need not be resolved at this stage.

>memorandum shall be filed within ten (10) days after the filing of the objection.
>
>Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 14 , 2006